# Exhibit A (Part 1)

**LOAN AGREEMENT**

Dated as of April 16, 2015

Between

**1141 REALTY OWNER LLC**, as Borrower

and

**RIALTO MORTGAGE FINANCE, LLC,**
as Lender

{00979456;7}

I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION ............................................ 1
      Section 1.1    Definitions. ................................................................................ 1
             1.1.1    Certain Defined Terms ..................................................... 1
             1.1.2    Other Defined Terms ........................................................ 2
      Section 1.2    Principles of Construction ............................................... 14

II.   GENERAL TERMS ........................................................................................... 14
      Section 2.1    Loan ................................................................................. 14
      Section 2.2    Interest; Payments; Late Payment Charge. ................... 14
             2.2.1    Interest ............................................................................. 14
             2.2.2    Payments Before Maturity Date ...................................... 14
             2.2.3    Payment on Maturity Date ............................................... 15
             2.2.4    Late Payment Charge ....................................................... 15
             2.2.5    Usury Savings .................................................................. 15
      Section 2.3    Prepayments. ................................................................. 16
             2.3.1    Voluntary Prepayments .................................................... 16
             2.3.2    Mandatory Prepayments .................................................. 16
             2.3.3    Prepayments After Default ............................................... 16
             2.3.4    Prepayment Prior to Permitted Defeasance Date............. 16
      Section 2.4    Making of Payments ....................................................... 17
      Section 2.5    Defeasance. ..................................................................... 17
             2.5.1    Voluntary Defeasance....................................................... 17
             2.5.2    Release of Property .......................................................... 18
      Section 2.6    Release on Payment in Full ............................................ 19
      Section 2.7    Assignment of Security Instrument ................................. 19

III.  REPRESENTATIONS AND WARRANTIES .................................................. 19
      Section 3.1    Borrower Representations ............................................... 19
             3.1.1    Organization ..................................................................... 19
             3.1.2    Authority............................................................................ 20
             3.1.3    Validity of Documents ...................................................... 20
             3.1.4    Litigation........................................................................... 20
             3.1.5    Warranty of Title .............................................................. 20
             3.1.6    Property Status and Condition .......................................... 21
             3.1.7    Leases ................................................................................ 21
             3.1.8    Solvency ............................................................................ 22
             3.1.9    Financial Information ........................................................ 22
             3.1.10   Not a Foreign Person ........................................................ 22
             3.1.11   Filing and Recording Taxes .............................................. 22
             3.1.12   Franchise Agreement......................................................... 23
             3.1.13   Management Agreement..................................................... 23
             3.1.14   Material Agreements and Operating Agreement ................ 23
             3.1.15   ERISA Compliance ........................................................... 23
             3.1.16   Business Purposes.............................................................. 23
             3.1.17   Taxes ................................................................................. 23
             3.1.18   OFAC.................................................................................. 23
             3.1.19   Intentionally Omitted......................................................... 23
             3.1.20   No Change in Facts or Circumstances; Disclosure............. 23

|       | 3.1.21 | Intentionally Omitted | 24 |
|       | 3.1.22 | Intentionally Omitted | 24 |
|       | 3.1.23 | Discounted Payoff | 24 |
|       | 3.1.24 | Union/Collective Bargaining Agreements | 24 |
| | Section 3.2 | Survival of Representations | 24 |
| IV. | | BORROWER COVENANTS | 24 |
| | Section 4.1 | Covenants | 24 |
|       | 4.1.1 | Existence; Compliance with Legal Requirements | 24 |
|       | 4.1.2 | Taxes and Other Charges | 25 |
|       | 4.1.3 | Maintenance of Property | 25 |
|       | 4.1.4 | Financial Reporting | 26 |
|       | 4.1.5 | Litigation | 27 |
|       | 4.1.6 | Leasing Matters | 27 |
|       | 4.1.7 | Alterations | 29 |
|       | 4.1.8 | Management Agreement | 29 |
|       | 4.1.9 | Hotel Covenants | 30 |
|       | 4.1.10 | Intentionally Omitted | 31 |
|       | 4.1.11 | Performance of Other Agreements | 31 |
|       | 4.1.12 | Transfers | 31 |
|       | 4.1.13 | O&M Program | 34 |
|       | 4.1.14 | Patriot Act Compliance | 34 |
|       | 4.1.15 | Debt Cancellation | 34 |
|       | 4.1.16 | Name, Identity, Structure, or Principal Place of Business | 34 |
|       | 4.1.17 | Access to the Property | 34 |
|       | 4.1.18 | Notice of Default | 35 |
|       | 4.1.19 | Further Assurances | 35 |
|       | 4.1.20 | Intentionally Omitted | 35 |
|       | 4.1.21 | Estoppel Statement | 35 |
|       | 4.1.22 | Violations | 35 |
|       | 4.1.23 | Permanent Certificate of Occupancy | 35 |
|       | 4.1.24 | Liquor License(s) | 35 |
|       | 4.1.25 | Required Repairs | 37 |
| V. | | INSURANCE; CASUALTY; CONDEMNATION | 37 |
| | Section 5.1 | Insurance | 37 |
| | Section 5.2 | Casualty | 40 |
| | Section 5.3 | Condemnation | 40 |
| | Section 5.4 | Restoration | 41 |
| VI. | | RESERVE FUNDS | 44 |
| | Section 6.1 | Intentionally Omitted | 44 |
| | Section 6.2 | Tax Funds | 44 |
|       | 6.2.1 | Deposits | 44 |
|       | 6.2.2 | Release of Tax Funds | 44 |
| | Section 6.3 | Insurance Funds | 44 |
|       | 6.3.1 | Deposits of Insurance Funds | 44 |
|       | 6.3.2 | Release of Insurance Funds | 45 |
| | Section 6.4 | Capital Expenditure Funds | 45 |

|  | 6.4.1 | Deposits of Capital Expenditure Funds | 45 |
|  | 6.4.2 | Release of Capital Expenditure Funds | 45 |
|  | Section 6.5 | Intentionally Omitted. | 46 |
|  | Section 6.6 | Intentionally Omitted. | 46 |
|  | Section 6.7 | Intentionally Omitted. | 46 |
|  | Section 6.8 | Excess Cash Flow Funds. | 46 |
|  | 6.8.1 | Deposits of Excess Cash Flow Funds | 46 |
|  | 6.8.2 | Release of Excess Cash Flow Funds. | 46 |
|  | Section 6.9 | Intentionally Omitted. | 46 |
|  | Section 6.10 | Reserve Funds, Generally. | 46 |
|  | 6.10.1 | Security Interest | 46 |
|  | 6.10.2 | Investments; Income Taxes | 46 |
|  | 6.10.3 | Costs | 46 |
| VII. | DEFAULTS | | 46 |
|  | Section 7.1 | Event of Default. | 46 |
|  | Section 7.2 | Remedies. | 48 |
|  | Section 7.3 | Remedies Cumulative; Waivers | 48 |
| VIII. | SPECIAL PROVISIONS | | 48 |
|  | Section 8.1 | Sale of Mortgage and Securitization. | 48 |
|  | Section 8.2 | Securitization Indemnification. | 50 |
|  | Section 8.3 | Servicer | 51 |
|  | Section 8.4 | Mezzanine Loan; Components | 51 |
|  | Section 8.5 | Single Purpose Entity | 52 |
|  | Section 8.6 | Exculpation | 52 |
|  | Section 8.7 | Additional Financial Information. | 55 |
| IX. | MISCELLANEOUS | | 57 |
|  | Section 9.1 | Survival. | 57 |
|  | Section 9.2 | Lender's Discretion | 57 |
|  | Section 9.3 | Governing Law | 57 |
|  | Section 9.4 | Modification, Waiver in Writing | 58 |
|  | Section 9.5 | Delay Not a Waiver | 58 |
|  | Section 9.6 | Notices | 58 |
|  | Section 9.7 | Trial by Jury. | 59 |
|  | Section 9.8 | Headings. | 59 |
|  | Section 9.9 | Severability | 59 |
|  | Section 9.10 | Preferences. | 59 |
|  | Section 9.11 | Waiver of Notice. | 59 |

{00979456;7}

Section 9.12    Remedies of Borrower ......................................................... 60
Section 9.13    Expenses; Indemnity .......................................................... 60
Section 9.14    Schedules and Exhibits Incorporated .................................... 61
Section 9.15    Offsets, Counterclaims and Defenses ................................... 61
Section 9.16    No Joint Venture or Partnership; No Third Party Beneficiaries ........ 62
Section 9.17    Publicity ........................................................................ 62
Section 9.18    Waiver of Marshalling of Assets ......................................... 62
Section 9.19    Waiver of Counterclaim ..................................................... 62
Section 9.20    Conflict; Construction of Documents; Reliance ...................... 62
Section 9.21    Brokers and Financial Advisors ........................................... 63
Section 9.22    Joint and Several Liability .................................................. 63
Section 9.23    Limitation on Liability ....................................................... 63
Section 9.24    Prior Agreements .............................................................. 63
Section 9.25    Collateral Agent ............................................................... 63

SCHEDULE I        Single Purpose Entity
SCHEDULE II       Organizational Chart
SCHEDULE III      Rent Roll
SCHEDULE IV       Required Repairs – Deadlines for Completion
SCHEDULE V        Updated Information
SCHEDULE VI       O&M Program
SCHEDULE VII      Planned Capital Expenditures
SCHEDULE VIII     Note A Scheduled Amortized Payment
SCHEDULE IX       Note B Applicable Interest Rate
SCHEDULE X        Note B Scheduled Amortized Payment

{00979456;7}

**LOAN AGREEMENT**

THIS LOAN AGREEMENT, dated as of April 16, 2015 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "<u>Agreement</u>"), between **RIALTO MORTGAGE FINANCE, LLC**, a Delaware limited liability company, having an address at 600 Madison Avenue, 12th Floor, New York, New York 10022 ("**Lender**"), and **1141 REALTY OWNER LLC**, a Delaware limited liability company, having an address at c/o Moses & Singer LLP, 405 Lexington Avenue, New York, New York 10174 ("**Borrower**").

W I T N E S S E T H :

WHEREAS, Borrower desires to obtain the Loan (as hereinafter defined) from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

**I.      DEFINITIONS; PRINCIPLES OF CONSTRUCTION**

**Section 1.1**      Definitions.

1.1.1      <u>Certain Defined Terms</u>.  For all purposes of this Agreement, the following terms shall have the meanings ascribed to them below:

"<u>Alteration Threshold</u>" shall mean an amount equal to the greater of (i) one percent (1%) of the original Loan amount and (ii) $1,000,000.

"<u>Applicable Interest Rate</u>" shall mean the Note A Applicable Interest Rate or the Note B Applicable Interest Rate, as applicable.

"<u>Franchisor</u>" shall mean any replacement franchisor approved by Lender in accordance with the terms of this Agreement.

"<u>Free Window Date</u>" shall mean the Payment Date that occurs four (4) months prior to the Stated Maturity Date.

"<u>Guarantor</u>" shall mean individually and collectively as the context may require **JAGDISH VASWANI**, an individual, and **ROBERT K.Y. CHAN**, an individual, and any other Person guaranteeing any payment or performance obligation of Borrower.

"<u>Initial Capital Expenditure Deposit</u>" shall mean an amount equal to $800,000.

"<u>Initial Insurance Deposit</u>" shall mean an amount equal to $14,582.86.

"<u>Initial Tax Deposit</u>" shall mean an amount equal to $196,223.35.

"<u>Key Principal</u>" shall mean Jagdish Vaswani.

"<u>Loan</u>" shall mean the loan in the original principal amount of **TWENTY-FIVE MILLION AND 00/100 DOLLARS ($25,000,000.00)** made by Lender to Borrower pursuant to this Agreement.

"<u>Manager</u>" shall mean **YOU GOTTA HAVE FAITH REALTY, LLC**, a Delaware limited liability company, or, if the context requires, a Qualified Manager that manages the Property in accordance with the terms and provisions of this Agreement and the other Loan Documents pursuant to a Replacement Management Agreement.

"**Monthly Capital Expenditure Deposit**" shall mean the greater of (a) an amount equal to one-twelfth (1/12) of (i) four percent (4%) of revenue generated from all hotel rooms at the Property and (ii) $0.20 per square foot of food and beverage space at the Property during the calendar year immediately preceding the calendar year in which such Payment Date occurs and (b) the aggregate amount, if any, required to be reserved under the Management Agreement and any Franchise Agreement.

"**Permitted Defeasance Date**" shall mean the date that is two (2) years from the "startup day" within the meaning of Section 860G(a)(9) of the Code of the REMIC Trust established in connection with the last Securitization involving any portion of the Loan.

"**Permitted Release Date**" shall mean the date that is the earlier of (a) three (3) years from the Closing Date or (b) Permitted Defeasance Date.

"**Reserve Funds**" shall mean, collectively, the Tax Funds, the Insurance Funds, the Capital Expenditure Funds, the Excess Cash Flow Funds and any other escrow or reserve fund established by the Loan Documents.

"**Restoration Threshold**" shall mean an amount equal to two percent (2%) of the Outstanding Principal Balance.

"**Stated Maturity Date**" shall mean May 6, 2025.

1.1.2   Other Defined Terms.   For all purposes of this Agreement, except as otherwise expressly provided:

"**Accrual Period**" shall mean, with respect to any Payment Date, the period commencing on the sixth (6th) day of the preceding month and ending on the fifth (5th) day of the calendar month in which such Payment Date occurs, provided that if the Closing Date is any date other than the sixth (6th) day of a month, the first Accrual Period shall (i) consist of only the date hereof, if the date hereof is the fifth (5th) day of a month, or (ii) commence on the date hereof and shall end on the immediately following fifth (5th) day of a calendar month.

"**Affiliate**"  shall mean, as to any Person, any other Person that (i) directly or indirectly, owns ten percent (10%) or more of legal, beneficial or economic interests in such Person, (ii) is in control of, is controlled by or is under common ownership or control with such Person, (iii) is a director or officer of such Person or of an Affiliate of such Person and/or (iv) is the spouse, issue or parent of such Person or of an Affiliate of such Person.

"**Affiliate Licensee Transferee**" shall have the meaning set forth in Section 4.1.24 hereof.

"**Affiliated Manager**" shall mean any property manager which is an Affiliate of Borrower or any Guarantor.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Approved Annual Budget**" shall have the meaning set forth in the Cash Management Agreement.

"**Approved Capital Expenditures**" shall have the meaning set forth in Section 6.4.1 hereof.

"**Approved Leasing Expenses**" shall have the meaning set forth in Section 6.5.1 hereof.

"**Assignment of Leases**" shall mean, that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender all of Borrower's interest in and to the Leases and Rents of the Property as security for the

Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean that certain Assignment of Management Agreement and Subordination of Management Fees dated the date hereof among Lender, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy Action**" shall mean, with respect to any Person, (i) such Person filing a voluntary petition under the Bankruptcy Law; (ii) the filing of an involuntary petition against such Person under the Bankruptcy Law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (iii) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Law; (iv) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property; or (v) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"**Bankruptcy Code**" shall mean Title 11 U.S.C. § 101 et seq., and the regulations adopted and promulgated pursuant thereto (as the same may be amended from time to time).

"**Bankruptcy Law**" shall mean the Bankruptcy Code, any other federal, state or foreign bankruptcy or insolvency law and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Broker**" shall have the meaning set forth in Section 9.21 hereof.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"**Capital Expenditure Account**" shall have the meaning set forth in Section 6.4.1 hereof.

"**Capital Expenditure Funds**" shall have the meaning set forth in Section 6.4.1 hereof.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under GAAP and the Uniform System of Accounts (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Cash Management Account**" shall have the meaning set forth in the Cash Management Agreement.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement, dated as of the date hereof, between Lender and Borrower, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Sweep Event**" shall have the meaning set forth in the Cash Management Agreement.

"**Cash Sweep Event Period**" shall have the meaning set forth in the Cash Management Agreement.

"**Casualty**" shall have the meaning set forth in Section 5.2 hereof.

{00979456;7}

-3-

"**Casualty Consultant**" shall have the meaning set forth in Section 5.4(b)(iii) hereof.

"**Casualty Retainage**" shall have the meaning set forth in Section 5.4(b)(iv) hereof.

"**Clearing Account**" shall have the meaning set forth in the Cash Management Agreement.

"**Clearing Account Agreement**" shall have the meaning set forth in the Cash Management Agreement.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in Section 5.4(b) hereof.

"**control**" (and the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of the business and affairs of the entity in question by reason of the ownership of beneficial interests, by contract or otherwise.

"**Debt**" shall mean the Outstanding Principal Balance, together with all interest accrued and unpaid thereon and all other sums payable to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document.

"**Debt Service Coverage Ratio**" shall have the meaning set forth in the Cash Management Agreement.

"**Default Rate**" shall mean the Note A Default Rate or the Note B Default Rate, as applicable.

"**Defeasance Collateral**" shall have the meaning set forth in Section 2.5.1(b) hereof.

"**Defeasance Date**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Defeasance Deposit**" shall mean an amount sufficient to purchase U.S. Obligations necessary to meet the Scheduled Defeasance Payments, pay any costs and expenses incurred or to be incurred in the purchase of U.S. Obligations necessary to meet the Scheduled Defeasance Payments and pay any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of Section 2.4 hereof.

"**Defeasance Event**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Defeasance Security Agreement**" shall have the meaning set forth in Section 2.5.1(a) hereof.

"**Disclosure Document**" shall have the meaning set forth in Section 8.2 hereof.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**Event of Default**" shall have the meaning set forth in Section 7.1 hereof.

"**Excess Cash Flow**" shall have the meaning set forth in the Cash Management Agreement.

"**Excess Cash Flow Account**" shall have the set forth in Section 6.8.1 hereof.

"**Excess Cash Flow Funds**" shall have the meaning set forth in Section 6.8.1 hereof.

"**Exchange Act**" shall have the meaning set forth in Section 8.2 hereof.

"**Exchange Act Filing**" shall mean a filing pursuant to the Exchange Act in connection with or relating to a Securitization.

"**Extraordinary Lease Payments**" shall mean any amounts paid to Borrower in connection with a termination, cancellation, surrender, modification, sale or other disposition of any Lease or any portion thereof, other than amounts paid for rent and other charges in respect of periods prior to the date of such termination, cancellation, surrender, modification, sale or other disposition.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Franchise Agreement**" shall mean any franchise agreement approved by Lender in accordance with the terms of this Agreement.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever for any governmental unit (federal, State, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"**Gross Income from Operations**" shall have the meaning set forth in the Cash Management Agreement.

"**Guaranty**" shall mean that certain Guaranty of Recourse Obligations, dated as of the date hereof, from Guarantor to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Improvements**" shall have the meaning set forth in Article 1 of the Security Instrument with respect to the Property.

"**Indebtedness**" shall mean, for any Person, without duplication, any debt or liability, secured or unsecured, direct or contingent (including any guaranty).

"**Indemnified Liabilities**" shall have the meaning set forth in Section 9.13 hereof.

"**Indemnified Parties**" shall mean Lender and any person or entity who is or will have been involved in the origination of the Loan, any person or entity who is or will have been involved in the servicing of the Loan, any person or entity in whose name the encumbrance created by the Security

Instrument is or will have been recorded and persons and entities who may hold or acquire or will have held a full or partial interest in the Loan, including, but not limited to, custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan.

"**Independent Director**" shall have the meaning set forth in Schedule 1 attached hereto.

"**Insolvency Opinion**" shall mean any bankruptcy non-consolidation opinion letter delivered to Lender in connection with the Loan.

"**Insurance Account**" shall have the meaning set forth in Section 6.3.1 hereof.

"**Insurance Funds**" shall have the meaning set forth in Section 6.3.1 hereof.

"**Insurance Premiums**" shall have the meaning set forth in Section 5.1(b) hereof.

"**Insurance Proceeds**" shall have the meaning set forth in Section 5.4(b) hereof.

"**Investor**" shall have the meaning set forth in Section 8.1(b) hereof.

"**Leases**" shall have the meaning set forth in Article 1 of the Security Instrument.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of Governmental Authorities at any time affecting the Loan, any Secondary Market Transactions, Borrower, Guarantor or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Securities Act, the Exchange Act, Regulations AB, S-K and S-X under the Securities Act, the rules and regulations promulgated pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, zoning and land use laws, the Americans with Disabilities Act of 1990, as amended, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower, Guarantor or the Property or any part thereof, including, without limitation, any which may (y) require repairs, modifications or alterations in or to the Property or any part thereof or (z) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"**Licensee**" shall mean, collectively, **9 WEST 26 ST. REST., LLC**, a New York limited liability company, and **TOSHI'S PENTHOUSE INC.**, a New York corporation, which are the holders of the Liquor License.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Property, any portion thereof or any direct or indirect interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Liquor License**" shall mean, collectively, (i) Hotel Liquor License certificate License Serial No. 1257575 issued to **9 WEST 26 ST. REST., LLC**, a New York limited liability company, on January 24, 2014, and expiring on January 31, 2016, (ii) License Serial No. 1266611 issued to **9 WEST 26 ST. REST., LLC**, a New York limited liability company, on February 1, 2014, and expiring on January 31, 2016, and (iii) License Serial No. 1266607 issued

to **TOSHI'S PENTHOUSE INC.**, a New York corporation, on January 1, 2015, and expiring on December 31, 2016, as each may be replaced, modified or extended.

"**Liquor License Cooperation Agreement**" shall mean that certain Cooperation Agreement Regarding Liquor License, dated as of even date herewith, by Borrower and Licensee in favor of Lender.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, the Environmental Indemnity, the Assignment of Management Agreement, the Guaranty, the Clearing Account Agreement, the Cash Management Agreement, the Liquor License Cooperation Agreement and all other documents executed and/or delivered in connection with the Loan.

"**Losses**" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense).

"**Major Lease**" shall mean any Lease with respect to any portion of the Property. Notwithstanding anything contained herein to the contrary, the usage of hotel units or banquet, meeting or food and beverage space substantially in accordance with the current ordinary course of operations of the Property shall not constitute a "Major Lease."

"**Management Agreement**" shall mean that certain Management Agreement, dated as of April 16, 2015, between Borrower and Manager, pursuant to which the Manager is to provide management and other services with respect to the Property, or, if the context requires, the Replacement Management Agreement executed in accordance with the terms and provisions of this Agreement.

"**Material Adverse Effect**" shall mean any material adverse effect upon (i) the business operations, economic performance, assets, condition (financial or otherwise), equity, contingent liabilities, material agreements or results of operations of Borrower, Guarantor or the Property, (ii) the ability of Borrower or Guarantor to perform its obligations under any Loan Document to which it is a party, (iii) the enforceability or validity of any Loan Document, the perfection or priority of any Lien created under any Loan Document or the rights, interests and remedies of Lender under any Loan Document or (iv) the value, use or operation of the Property or the cash flows from the Property.

"**Material Agreements**" shall mean (i) each management, franchise, brokerage or leasing agreement (other than the Management Agreement and any Franchise Agreement), and (ii) any cleaning, maintenance, service or other contract or agreement of any kind (other than the Leases) of a material nature (materiality for purposes of this definition shall include, without limitation, any contract with a term longer than one year or any contract that is not cancelable on thirty (30) days' or less notice without the payment of any termination fee or payments of any kind), in either case relating to the ownership, development, leasing, management, use, operation, maintenance, repair, improvement or restoration of the Property, whether written or oral.

"**Maturity Date**" shall mean the Stated Maturity Date, or such other date on which the final payment of the principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

{00979456;7}

-7-

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such State or States whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Mezzanine Borrower**" shall have the meaning set forth in Section 8.4 hereof.

"**Mezzanine Loan**" shall have the meaning set forth in Section 8.4 hereof.

"**Minimum Disbursement Amount**" shall mean Ten Thousand and No/100 Dollars ($10,000.00).

"**Monthly Debt Service Payment Amount**" shall mean an amount equal to the sum of the Note A Monthly Debt Service Payment Amount and the Note B Monthly Debt Service Payment Amount.

"**Monthly Insurance Deposit**" shall have the meaning set forth in Section 6.3.1 hereof.

"**Monthly Tax Deposit**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Net Cash Flow**" for any period shall mean the amount obtained by subtracting Operating Expenses and Capital Expenditures for such period from Gross Income from Operations for such period.

"**Net Operating Income**" means the amount obtained by subtracting Operating Expenses from Gross Income from Operations.

"**Net Proceeds**" shall have the meaning set forth in Section 5.4(b) hereof.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 5.4(b)(vi) hereof.

"**Note**" shall mean, collectively, Note A and Note B.

"**Note A**" shall mean that certain Consolidated, Amended and Restated Promissory Note A, dated the date hereof, in the stated principal amount of Twenty Two Million Five Hundred Thousand and 00/100 Dollars ($22,500,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Note A Applicable Interest Rate**" shall mean a rate per annum equal to 4.913%.

"**Note A Default Rate**" shall mean, with respect to Note A, a rate per annum equal to the lesser of (i) the Maximum Legal Rate or (ii) five percent (5%) above the Note A Applicable Interest Rate.

"**Note A Monthly Debt Service Payment Amount**" shall mean, with respect to each Monthly Payment Date, an amount equal to (i) all interest that has accrued on the Note A Outstanding Principal Balance during the immediately preceding Accrual Period and (ii) the Note A Scheduled Amortization Payment.

"**Note A Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of Note A.

"**Note A Scheduled Amortization Payment**" shall mean, with respect to each Monthly Payment Date, the amount set forth on Schedule VIII.

{00979456;7}

"**Note B**" shall mean that certain Promissory Note B, dated the date hereof, in the stated principal amount of Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,00.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Note B Applicable Interest Rate**" shall mean, with respect to each Accrual Period, the rate per annum set forth on Schedule IX relating to each such Accrual Period.

"**Note B Default Rate**" shall mean, with respect to Note B, a rate per annum equal to the lesser of (i) the Maximum Legal Rate or (ii) five percent (5%) above the Note B Applicable Interest Rate.

"**Note B Monthly Debt Service Payment Amount**" shall mean, with respect to each Monthly Payment Date, an amount equal to the principal and/or interest amount set forth set forth on Schedule X.

"**Note B Outstanding Principal Balance**" shall mean, as of any date, the outstanding principal balance of Note B.

"**Note B Scheduled Amortization Payment**" shall mean, with respect to each Monthly Payment Date, the amount set forth on Schedule X.

"**NRSRO**" shall mean any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged in connection with, or in anticipation of, a Securitization.

"**O&M Program**" shall have the meaning set forth in Section 4.1.13 hereof.

"**Obligations**" shall mean Borrower's obligation to pay the Debt and perform its obligations under the Note, this Agreement and the other Loan Documents.

"**OFAC**" shall mean the Office of Foreign Assets Control or, if the context requires, any successor Governmental Authority.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized senior officer of Borrower.

"**Operating Agreements**" shall mean, collectively, any easements (including any reciprocal easement agreement) covenants, restrictions or agreements of record relating to the construction, operation or use of the Property.

"**Operating Expenses**" shall have the meaning set forth in the Cash Management Agreement.

"**Organizational Documents**" shall mean, as to any Person, the organizational or governing documents of such Person, including the certificate of incorporation and by-laws with respect to a corporation; the certificate of formation or organization and operating agreement with respect to a limited liability company; and the certificate of limited partnership and partnership agreement with respect to a limited partnership.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

{00979456;7}

"**Outstanding Principal Balance**" shall mean, as of any date, the sum of the Note A Outstanding Principal Balance and Note B Outstanding Principal Balance.

"**Patriot Act**" shall mean, collectively, all laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107 56), as the same may be amended, replaced, supplemented or otherwise modified from time to time.

"**Payment Date**" shall mean the sixth (6th) day of each calendar month prior to the Maturity Date commencing on (i) the sixth (6th) day of the next succeeding calendar month after the date hereof if the Closing Date is on or prior to the sixth (6th) day of a calendar month; or (ii) the sixth (6th) day of the second succeeding calendar month after the date hereof if the Closing Date is after the sixth (6th) day of a calendar month.

"**Permitted Encumbrances**" shall have the meaning set forth in Section 3.1.5 hereof.

"**Permitted Investments**" shall have the meaning set forth in the Cash Management Agreement.

"**Permitted Transfer**" shall mean any of the following: (i) any transfer, directly as a result of the death of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by the decedent in question to the Person or Persons lawfully entitled thereto, (ii) any transfer, directly as a result of the legal incapacity of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by such natural person to the Person or Persons lawfully entitled thereto, (iii) any Lease of space in the Improvements to Tenants in accordance with the terms and provisions of Section 4.1.6 hereof and (iv) any Transfer permitted without Lender's prior consent in accordance with the terms and provisions of Section 4.1.12 hereof.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Planned Capital Expenditures**" shall mean those certain Capital Expenditures set forth on Schedule VII.

"**Policy**" or "**Policies**" shall have the meaning set forth in Section 5.1(b) hereof.

"**Prohibited Person**" shall means any Person subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., the Patriot Act, the Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated under any such legislation, including those related to Specially Designated Nationals and Specially Designated Global Terrorists or listed in the Annex to, or is otherwise subject to the prohibitions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Executive Orders.

"**Property**" shall mean each parcel of real property, the Improvements thereon and all personal property owned by Borrower and encumbered by the Security Instrument, together with all rights pertaining to the Property and Improvements, as more particularly described in Article 1 of the Security Instrument and referred to therein as the "Property".

{00979456;7}

"**Provided Information**" shall have the meaning set forth in Section 8.2 hereof.

"**Qualified Franchisor**" shall mean a reputable and experienced franchisor that, in the reasonable judgment of Lender, possesses experience in flagging hotel properties similar in location, size, class, use, operation and value as the Property; provided, that Borrower shall have obtained a Rating Agency Confirmation from the Rating Agencies.

"**Qualified Manager**" shall mean a reputable and experienced manager (which may be an Affiliate of Borrower) that is not a Prohibited Person and that, in the reasonable judgment of Lender, possesses experience in managing properties similar in location, size, class, use, operation and value as the Property; provided, that Borrower shall have obtained (a) a Rating Agency Confirmation from the Rating Agencies and (b) if such Person is an Affiliate of Borrower, an Insolvency Opinion reasonably acceptable to Lender and acceptable the Rating Agencies in their sole discretion.

"**Rating Agencies**" shall mean any NRSRO, including those designated by Lender to assign a rating to the Securities.

"**Rating Agency Confirmation**" shall mean written confirmation from each Rating Agency designated by Lender to assign a rating to any Securities that any particular act or omission shall not result in downgrade, withdrawal or qualification of the then current ratings assigned to any ratings of the Securities or the proposed rating of any Securities. In the event that, at any given time, no Rating Agency has elected to consider whether to grant or withhold such an affirmation, then the term "Rating Agency Confirmation" shall be deemed instead to require the written approval of Lender based on its good faith determination of whether the Rating Agencies would issue a Rating Agency Confirmation; provided that the foregoing good faith standard shall be inapplicable in any case in which Lender has an independent approval right in respect of the matter at issue pursuant to the terms of this Agreement.

"**Related Loan**" shall mean (i) a loan made to an Affiliate of Borrower or Guarantor or secured by a Related Property that is included in a Securitization with the Loan or any portion thereof or interest therein or (ii) any loan that is cross-collateralized or cross-defaulted with the Loan.

"**Related Property**" shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" within the meaning of the definition of "Significant Obligor" to the Property.

"**REMIC Trust**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

"**Rents**" shall have the meaning set forth in Article 1 of the Security Instrument with respect to the Property.

"**Replacement Franchise Agreement**" shall mean, collectively, (a)(i) a franchise, trademark and license agreement with a Qualified Franchisor substantially in the same form and substance as any Franchise Agreement, or (ii) a franchise, trademark and license agreement with a Qualified Franchisor, which franchise, trademark and license agreement shall be in form and substance reasonably acceptable to Lender, and (b) an assignment of franchise agreement and subordination of franchise fees substantially in the form then used by Lender (or in such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Franchisor.

"**Replacement Liquor License Cooperation Agreement**" shall have the meaning set forth in Section 4.1.24 hereof.

"**Replacement Management Agreement**" shall mean, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager, which management agreement shall be reasonably acceptable to Lender in form and substance, and (b) an assignment of management agreement substantially in the form of the Assignment of Management Agreement (or such other form reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense.

"**Replacement Note**" shall have the meaning set forth in Section 8.4 hereof.

"**Required Number of Independent Directors**" shall mean two.

"**Required Repairs**" shall have the meaning set forth in Section 4.1.25 hereof.

"**Restoration**" shall mean the repair and restoration of the Property after a Casualty or Condemnation as nearly as possible to the condition the Property was in immediately prior to such Casualty or Condemnation, with such alterations as may be approved by Lender.

"**Restricted Party**" shall mean, collectively, (i) Borrower, any SPC Party, any Affiliated Manager and Guarantor and (ii) any shareholder, partner, member, non-member manager or any other direct or indirect legal or beneficial owner of Borrower, any SPC Party, any Affiliated Manager, Guarantor or any non-member manager.

"**RIALTO**" shall have the meaning set forth in Section 8.2 hereof.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"**Scheduled Defeasance Payments**" shall have the meaning set forth in Section 2.5.1(b) hereof.

"**Secondary Market Transaction**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Securities**" shall have the meaning set forth in Section 8.1 hereof.

"**Securities Act**" shall have the meaning set forth in Section 8.2 hereof.

"**Securitization**" shall have the meaning set forth in Section 8.1 hereof.

"**Securitization Indemnification Liabilities**" shall have the meaning set forth in Section 8.2 hereof.

"**Securitization Indemnified Parties**" shall have the meaning set forth in Section 8.2 hereof.

"**Security Instrument**" shall mean that certain first priority consolidated, amended and restated mortgage, deed of trust or deed to secure debt, as applicable, assignment of leases and rents, fixture filing and security agreement, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Servicer**" shall have the meaning set forth in Section 8.3 hereof.

"**Servicing Agreement**" shall have the meaning set forth in Section 8.3 hereof.

"**Significant Obligor**" shall have the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

"**Single Purpose Entity**" shall have the meaning set forth in Schedule I hereof.

"**SPC Party**" shall have the meaning set forth on Schedule I hereof.

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Successor Borrower**" shall have the meaning set forth in Section 2.5.1(c) hereof.

"**Survey**" shall mean a survey prepared by a surveyor licensed in the State where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Lender.

"**Tax Account**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Tax Funds**" shall have the meaning set forth in Section 6.2.1 hereof.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"**Title Insurance Policy**" shall mean, with respect to the Property, an ALTA mortgagee title insurance policy in a form acceptable to Lender (or, if the Property is located in a State which does not permit the issuance of such ALTA policy, such form as shall be permitted in such State and acceptable to Lender) issued with respect to the Property and insuring the lien of the Security Instrument encumbering the Property.

"**Transfer**" shall have the meaning set forth in Section 4.1.12 hereof.

"**Transferee**" shall have the meaning set forth in Section 4.1.12(d) hereof.

"**Transferee's Sponsors**" shall mean, with respect to any Transferee, such Transferee's shareholders, partners, members or non-member managers that, directly or indirectly, (i) own twenty-percent (20%) or more of legal, beneficial and economic interests in such Transferee or (ii) are in control of such Transferee.

"**Treasury Rate**" shall mean, at the time of the prepayment, as applicable, the rate of interest per annum equal to the yield to maturity (converted by Lender to the equivalent monthly yield using Lender's then system of conversion) of the United States Treasury obligations selected by the holder of the Note having maturity dates closest to, but not exceeding, the remaining term to the Free Window Date.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State or, if the context requires, in the State of Delaware.

"**U.S. Obligations**" shall mean (i) direct full faith and credit obligations of the United States of America that are not subject to prepayment, call or early redemption or (ii) to the extent acceptable to the Rating Agencies, other "government securities" within the meaning of Treasury Regulations Section 1.860G-2(a)(8)(ii).

"**Yield Maintenance Default Premium**" shall mean an amount equal to the greater of: (i) three percent (3%) of the principal amount of the Loan being repaid and (ii) the excess, if any, of (a) the present value (determined using a discount rate equal to the Treasury Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount of the Loan being repaid provided that the Note shall be deemed, for purposes of this definition, to be due and payable on the Free Window Date, over (b) the principal amount of the Loan being repaid.

{00979456;7}

"**Yield Maintenance Premium**" shall mean an amount equal to the greater of: (i) one percent (1%) of the principal amount of the Loan being prepaid and (ii) the excess, if any, of (a) the present value (determined using a discount rate equal to the Treasury Rate at such time) of all scheduled payments of principal and interest payable in respect of the principal amount of the Loan being prepaid provided that the Note shall be deemed, for purposes of this definition, to be due and payable on the Free Window Date, over (b) the principal amount of the Loan being prepaid.

Section 1.2    Principles of Construction.  All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.   Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## II.    GENERAL TERMS

Section 2.1    Loan.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan on the Closing Date. Borrower may request and receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed. The Loan shall be evidenced by the Note and secured by the Security Instrument, the Assignment of Leases and the other Loan Documents.

Section 2.2    Interest; Payments; Late Payment Charge.

2.2.1    Interest.  Interest on Note A Outstanding Principal Balance shall accrue and be payable from the Closing Date up to, but excluding, the Maturity Date at the Note A Applicable Interest Rate. Interest on the Note B Outstanding Principal Balance shall accrue and be payable from the Closing Date up to, but excluding, the Maturity Date at the Note B Applicable Interest Rate. Upon the occurrence and during the continuance of an Event of Default, (a) the Note A Outstanding Principal Balance and, to the extent permitted by law, overdue interest in respect of the Note A, shall accrue interest at the Note A Default Rate, and (b) the Note B Outstanding Principal Balance and, to the extent permitted by law, overdue interest in respect of the Note A, shall accrue interest at the Note B Default Rate. The Default Rate shall be computed from the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full. Nothing contained herein shall be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default. Interest on the Note A Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Note A) Applicable Interest Rate or the Note A Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the Note A Outstanding Principal Balance. Interest on the Note B Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360) day year (that is, the Note B Applicable Interest Rate or the Note B Default Rate, as then applicable, expressed as an annual rate divided by 360) by (c) the Note B Outstanding Principal Balance. Borrower hereby acknowledges that interest is to be calculated by Lender on the basis of a three hundred sixty (360) day year and is fully aware that such calculations may result in an accrual and/or payment of interest in amounts greater than corresponding interest calculations based on a three hundred sixty-five (365) day year.

2.2.2    Payments Before Maturity Date.  If the Closing Date is not the sixth (6th) day of a month, (a) Borrower shall make a payment to Lender of interest only with respect to Note A on the Closing Date for the initial Accrual Period.  Borrower shall make a payment to Lender equal to the

Note A Monthly Debt Service Payment Amount on each Payment Date to and including the Maturity Date. Each Note A Monthly Debt Service Payment Amount shall be applied first to the payment of interest that has accrued on the Note A Outstanding Principal Balance during the immediately preceding Accrual Period, and the balance, if any, shall be applied to the reduction of the Note A Outstanding Principal Balance, (b) Borrower shall make a payment to Lender of interest only with respect to Note B on the Closing Date for the initial Accrual Period. Borrower shall make a payment to Lender equal to the Note B Monthly Debt Service Payment Amount on each payment Date to and including the Maturity Date. Each Note B Monthly Debt Service Payment Amount shall be applied first the payment of interest that has accrued on the Note B Outstanding Principal Balance during the immediately preceding Accrual Period, and the balance, if any, shall be applied to the reduction the Note B Outstanding Principal Balance. Lender shall have the right to change the Payment Date to any other day of a calendar month selected by Lender, in its sole and absolute discretion (including in connection with a Securitization) upon notice to Borrower (in which event such change shall then be deemed effective) and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change; provided that if Lender shall have elected to change the Payment Date as aforesaid, (a) Lender shall have the option, but not the obligation, to adjust the Accrual Period accordingly, and (b) if Lender moves the Payment Date to a date that is before the sixth (6th) day of a calendar month, such amendment shall provide for a grace period for payments through the sixth (6th) day of each month.

    2.2.3    <u>Payment on Maturity Date</u>. Borrower shall pay to Lender on the Maturity Date the Outstanding Principal Balance, all interest which has accrued and is scheduled to accrue through and including the last day of the Accrual Period in which the Maturity Date occurs and all other amounts payable to Lender hereunder and under the Note, the Security Instrument and the other Loan Documents. In the event Lender changes the Payment Date in accordance with this Agreement, the Maturity Date shall also be deemed to have been changed such that the Maturity Date and the Payment Date shall occur on the same calendar day and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change.

    2.2.4    <u>Late Payment Charge</u>. If any principal, interest or any other sums due under the Loan Documents (other than the Outstanding Principal Balance due and payable on the Maturity Date) is not paid by Borrower on the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted under applicable Legal Requirements in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by applicable Legal Requirements. Nothing contained herein shall be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

    2.2.5    <u>Usury Savings</u>. This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable Legal Requirements, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

{00979456;7}

**Section 2.3**     Prepayments.

2.3.1     <u>Voluntary Prepayments.</u>  Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part. From and after the Free Window Date, Borrower may, at its option and upon not less than twenty (20) days prior written notice to Lender, prepay the Debt in whole (but not in part) without payment of the Yield Maintenance Premium, provided that Borrower pays to Lender (i) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date), and (ii) all other sums due and payable under this Agreement, the Note and the other Loan Documents; Lender shall provide a written statement of all amounts required to repay the Loan in full  and the basis of determination of the required prepayment consideration prior to the proposed prepayment date.  If a notice of prepayment is given by Borrower to Lender pursuant to this <u>Section 2.3.1</u>, the amount designated for prepayment and all other sums required under this <u>Section 2.3</u> shall be due and payable on the proposed prepayment date.

2.3.2     <u>Mandatory Prepayments.</u>  On each date on which Lender actually receives any Net Proceeds, if Lender is not obligated to and elects not to make such Net Proceeds available to Borrower for the restoration of the Property, Borrower shall prepay the Outstanding Principal Balance in an amount equal to one hundred percent (100%) of such Net Proceeds. No Yield Maintenance Premium shall be due in connection with any prepayment made pursuant to this <u>Section 2.3.2</u>. Notwithstanding anything to the contrary contained herein, so long as no Event of Default has occurred and remains outstanding, any principal prepayments made pursuant to this <u>Section 2.3.2</u> shall be applied to the reduction of the Note A Outstanding Principal Balance and to the reduction of the Note B Outstanding Principal Balance in such order and priority as agreed upon by the holders of Note A and Note B.

2.3.3     <u>Prepayments After Default.</u>  If, following an Event of Default which occurs prior to Free Window date, payment of all or any part of the Debt is tendered by Borrower or otherwise recovered by Lender, such tender or recovery shall be deemed a voluntary prepayment by Borrower in violation of the prohibition against prepayment set forth in <u>Section 2.3.1</u> and Borrower shall pay, in addition to the Debt, (i) an amount equal to the Yield Maintenance Default Premium, (ii) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date), and (iii) all other sums due and payable under this Agreement, the Note and the other Loan Documents.  Lender shall notify Borrower of the amount and the basis of determination of the required prepayment consideration.

2.3.4     <u>Prepayment Prior to Permitted Defeasance Date.</u>  If the Permitted Release Date has occurred but the Permitted Defeasance Date has not occurred, Borrower may, at its option and upon thirty (30) days prior written notice to Lender, prepay the Debt in whole (but not in part), provided that Borrower pays to Lender (i) the Yield Maintenance Premium, (ii) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the date of prepayment (or, if such prepayment occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date), and (iii) all other sums due and payable under this Agreement, the Note and the other Loan Documents. Lender shall notify Borrower of the amount and the basis of determination of the required prepayment consideration. If a notice of prepayment is given by Borrower to Lender pursuant to this <u>Section 2.3.4</u>, the amount designated for prepayment and all other sums required under this <u>Section 2.3</u> shall be due and payable on the proposed prepayment date. Lender shall not be obligated to accept any prepayment of the Debt unless it is accompanied by the prepayment consideration due in connection therewith.

**Section 2.4**   <u>Making of Payments</u>.  Except as otherwise specifically provided herein, all payments and prepayments under this Agreement, the Note and the other Loan Documents shall be made to Lender not later than 3:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or as otherwise directed by Lender in writing, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, such payment shall be made on the first Business Day succeeding such scheduled due date. All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

**Section 2.5**   Defeasance.

2.5.1   <u>Voluntary Defeasance</u>.  (a) Provided no Event of Default shall then exist, Borrower shall have the right at any time after the Permitted Defeasance Date and prior to the Free Window Date to voluntarily defease the entire Loan by and upon satisfaction of the following conditions (such event being a "**<u>Defeasance Event</u>**"): (i) Borrower shall provide not less than thirty (30) days prior written notice to Lender specifying the date (the "**<u>Defeasance Date</u>**") on which the Defeasance Event is to occur; (ii) Borrower shall pay to Lender (1) all accrued and unpaid interest on the Outstanding Principal Balance through and including the last day of the Accrual Period related to the Payment Date next occurring following the Defeasance Date (or, if the Defeasance Date occurs on a Payment Date, through and including the last day of the Accrual Period related to such Payment Date) and (2) all other sums then due and payable under the Note, this Agreement, the Security Instrument and the other Loan Documents; (iii) Borrower shall have delivered, or caused to be delivered, to Lender the Defeasance Deposit; (iv) intentionally omitted; (v) Borrower shall execute and deliver to Lender a separate security agreement, each in form and substance reasonably satisfactory to Lender, creating a first priority lien on the Defeasance Collateral purchased with the Defeasance Deposit in accordance with the provisions of this <u>Section 2.5</u> (collectively, the "**<u>Defeasance Security Agreement</u>**"); (vi) Borrower shall deliver an opinion of counsel for Borrower that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions stating, among other things, that Borrower has legally and validly transferred and assigned the Defeasance Collateral and all obligations, rights and duties under and to the Note to the Successor Borrower, that Lender has a perfected first priority security interest in the Defeasance Collateral delivered by Borrower and that any REMIC Trust formed pursuant to a Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of such Defeasance Event; (vii) Borrower shall deliver a Rating Agency Confirmation, and, if required by the applicable Rating Agencies, Borrower shall also deliver or cause to be delivered an Insolvency Opinion with respect to the Successor Borrower in form and substance reasonably satisfactory to Lender and the applicable Rating Agencies; (viii) Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this <u>Section 2.5.1(a)</u> have been satisfied; (ix) Borrower shall deliver a certificate of Borrower's independent certified public accountant certifying that the U.S. Obligations purchased with the Defeasance Deposit generate monthly amounts equal to or greater than the Scheduled Defeasance Payments; (x) Borrower shall deliver such other certificates, documents or instruments as Lender may reasonably request; (xi) Borrower shall have paid to Lender any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of this <u>Section 2.5</u>; and (xii) Borrower shall pay all reasonable, out of pocket costs and expenses of Lender incurred in connection with the Defeasance Event, including any costs and expenses associated with a release of the Lien of the Security Instrument as provided in <u>Section 2.5.2</u> hereof, as well as reasonable attorneys' fees and expenses, and Rating Agency fees, costs and expenses, if any.

(b)   In connection with a Defeasance Event, Borrower hereby appoints Lender as its agent and attorney-in-fact for the purpose of using the Defeasance Deposit to purchase U.S. Obligations

(the "**Defeasance Collateral**") which provide payments (i) on or prior to, but as close as possible to, the Business Day immediately preceding all scheduled payment dates and other scheduled payment dates, if any, under Note A and Note B after the Defeasance Date upon which payments are required under Note A and Note B, as applicable, and this Agreement, and (ii) in amount equal to the scheduled payments due on such payment dates or other scheduled payment dates under Note A and Note B and this Agreement (including, without limitation, scheduled payments of principal, interest, servicing fees (if any), and any other amounts due under the Loan Documents on such payment dates or other schedule payment dates including the state Maturity Date, as accelerated pursuant to the succeeding sentence), (collectively, the "**Schedule Defeasance Payments**"). Simultaneously with the delivery of the Defeasance Collateral and the satisfaction of all other conditions to the defeasance of the Loan set forth herein, the Stated Maturity Date shall be accelerated to the Free Window Date. Each of the U.S. Obligations that are part of the Defeasance Collateral shall be duly endorsed by the holder thereof as directed by Lender or accompanied by a written instrument of transfer in form and substance that would be satisfactory to a prudent institutional lender (including, without limitation, such instruments as may be required by the depository institution holding such securities or by the issuer thereof, as the case may be, to effectuate book entry transfers and pledges through the book entry facilities of such institution) in order to perfect upon the delivery of the Defeasance Collateral a first priority security interest therein in favor of Lender in conformity with all applicable state and federal laws governing the granting of such security interests. Borrower, pursuant to each Defeasance Security Agreement or other appropriate document, shall authorize and direct that the payments received from the Defeasance Collateral may be made directly to the Cash Management Account (unless otherwise directed by the holders of Note A and Note B) and applied to satisfy the obligations of Borrower under the Note. Any portion of the Defeasance Deposit in excess of the amount necessary to purchase the Defeasance Collateral required by this <u>Section 2.5</u> and satisfy Borrower's other obligations under this <u>Section 2.5</u> shall be remitted to Borrower.

(c)    In connection with any Defeasance Event, Lender, its designee or, at Lender's election, Borrower, shall establish or designate a separate successor entity for each of Note A and Note B (in each case, the "**Successor Borrower**") which shall be a single purpose bankruptcy remote entity under criteria established by the Rating Agencies, and Borrower shall transfer and assign all obligations, rights and duties under and to each of Note A and Note B together with the related pledged U.S. Obligations to such Successor Borrower. Such Successor Borrower shall assume the obligations under Note A and Note B and the related Defeasance Security Agreement and Borrower shall be relieved of its obligations under such documents and Guarantor shall be released from any liability under the Guaranty for acts and omissions first occurring after said assumption. Borrower shall pay $1,000 to any such Successor Borrower as consideration for assuming the obligations under Note A and Note B and the Defeasance Security Agreement. Notwithstanding anything in this Agreement to the contrary, no assumption fee shall be payable upon a transfer of the Note in accordance with this <u>Section 2.5.1(c)</u>, but Borrower shall pay all costs and expenses incurred by Lender, including Lender's reasonable attorneys' fees and expenses, incurred in connection therewith.

2.5.2    <u>Release of Property</u>.  Except as set forth in this <u>Section 2.5.2</u> or in <u>Section 2.6</u>, no repayment, prepayment or defeasance of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of any Lien of the Security Instrument on the Property. If Borrower has elected to defease the entire Loan and the requirements of <u>Section 2.5.1</u> have been satisfied, the Property shall be released from the Lien of the Security Instrument and the Defeasance Collateral, pledged pursuant to the Defeasance Security Agreement, shall be the sole source of collateral securing the Note. In connection with the release of the Security Instrument, Borrower shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date, a release of Lien

{00979456;7}

-18-

(and related Loan Documents) for the Property for execution by Lender. Such release shall be in a form appropriate in the jurisdiction in which the Property is located and that would be reasonably satisfactory to a prudent lender. In addition, Borrower shall provide all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such releases in accordance with the terms of this Agreement.

**Section 2.6**    Release on Payment in Full. Lender shall, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms and provisions of the Note and this Loan Agreement, release the Lien of the Security Instrument on the Property.

**Section 2.7**    Assignment of Security Instrument. Upon a release of the Property in accordance with Section 2.5.2 hereof, or payment in full of the Loan in accordance with Section 2.6 hereof, upon the written request and at the sole cost and expense of Borrower, Lender shall cooperate with Borrower to effect an assignment of the Note and the Security Instrument to a new lender in accordance with this Section 2.7. Lender shall assign the Note and the Security Instrument, each without recourse, covenant or warranty of any nature, express or implied (except that to the extent reasonably required by a title insurance company issuing a policy to such new lender, Lender will represent to such title insurance company (x) that Lender is the record and beneficial owner of the Note and the Security Instrument and (y) as to the outstanding principal balance of the Loan), to such new lender designated by Borrower (other than Borrower or a nominee of Borrower). In addition, any such assignment shall be conditioned on the following: (i) payment by Borrower of (A) Lender's administrative fee for processing assignments of mortgages, which administrative fee shall be reasonable and customary, and (B) the reasonable out-of-pocket costs and expenses of Lender incurred in connection therewith (including attorneys' fees and expenses for the preparation, delivery and performance of such an assignment); (ii) Borrower shall have caused the delivery of an executed Statement of Oath under Section 275 of the New York Real Property Law; (iii) such an assignment is not then prohibited by any federal, state or local law, rule, regulation or order or by any Governmental Authority; and (iv) Borrower shall provide such other documents, items and information which Lender determines to be reasonably necessary to effectuate such assignment. Borrower shall be responsible for all Security Instrument recording taxes, recording fees and other charges payable in connection with any such assignment. Lender agrees that the assignment of the Note and the Security Instrument to the new lender shall be accomplished by an escrow closing conducted through an escrow agent satisfactory to Lender and pursuant to an escrow agreement in form and substance satisfactory to Lender.

## III.    REPRESENTATIONS AND WARRANTIES

**Section 3.1**    Borrower Representations. Borrower represents and warrants as of the Closing Date that:

3.1.1    Organization. Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the State; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own the Property and carry on its business as now conducted and proposed to be conducted. Borrower now has and shall continue to have the full right, power and authority to operate and lease the Property, to encumber the Property as provided herein and to perform all of the other obligations to be performed by Borrower under the Note, this Agreement, the Security Instrument and the other Loan Documents. Borrower's principal place of business and chief executive office is and will continue to be the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing at least thirty (30) days prior to the date of such change). Borrower's organizational identification number, if any, assigned by the state of its incorporation or organization is 5724828. Borrower's federal tax identification number is 47-3661804. The organizational chart attached hereto as Schedule II is true, correct and complete on

and as of the date hereof. No Person, other than those Persons shown on <u>Schedule II</u>, has any ownership interest in, or right of control, directly or indirectly, in Borrower.

       3.1.2   <u>Authority</u>. Borrower (and the undersigned representative of Borrower, if any) has full power, authority and legal right to execute this Agreement, the Note, the Security Instruments and the other Loan Documents, and to mortgage, grant, bargain, sell, pledge, assign, warrant, set-over, transfer and convey the Property pursuant to the terms of the Loan Documents and to keep and observe all of the terms of the Loan Documents on Borrower's part to be performed.

       3.1.3   <u>Validity of Documents</u>. (a) The execution, delivery and performance of this Agreement, the Note, the Security Instrument and the other Loan Documents and the borrowing evidenced by the Note (i) are within the corporate, partnership, trust or limited liability company (as the case may be) power of Borrower; (ii) have been authorized by all requisite corporate, partnership, trust or limited liability company (as the case may be) action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by laws, partnership, trust, operating agreement or other governing instrument of Borrower, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created pursuant to the Loan Documents; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of this instrument in appropriate land records in the State where the Property is located and except for Uniform Commercial Code filings relating to the security interest created pursuant to the Loan Documents); and (b) this Agreement, the Note, the Security Instrument and the other Loan Documents constitute the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). The Loan Documents are not subject to any right of rescission, set off, counterclaim or defense by Borrower, any SPC Party, or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally and, as to enforceability, to principles of equity), and neither Borrower, any SPC Party nor Guarantor has asserted any right of rescission, set off, counterclaim or defense with respect thereto.

       3.1.4   <u>Litigation</u>. There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened against or affecting Borrower, any SPC Party, Guarantor or the Property that could have a Material Adverse Effect.

       3.1.5   <u>Warranty of Title</u>. Borrower has paid for and has good title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, set over, transfer and convey the same and that Borrower possesses an unencumbered fee simple absolute estate in the Land and the Improvements and that it owns the Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of the Security Instrument (the "**Permitted Encumbrances**"). The Security Instrument, together with any Uniform Commercial Code financing statements required to be filed in connection therewith (when properly recorded and/or filed, as applicable, in the appropriate records) will create (a) a valid, perfected first priority lien on the Property, subject only to Permitted Encumbrances, and (b) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to the Permitted Encumbrances. All personal property necessary to operate the Property in the manner it is currently operated is owned by Borrower and included within the Property encumbered by the

Security Instrument. The Permitted Encumbrances do not and will not, individually or in the aggregate, materially adversely affect or interfere with the value, current use or operation of the Property, the security intended to be provided by the Security Instrument, or the ability of Borrower to pay or perform its obligations when due in accordance with the Note or the other Loan Documents. Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of the Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

    3.1.6   <u>Property Status and Condition</u>. (a) No portion of the Improvements is located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, or any successor law, or, if located within any such area, Borrower has obtained and will maintain the insurance prescribed in <u>Section 5.1</u>; (b) Borrower has obtained, or caused to be obtained, all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification; (c) the Property and the present and contemplated use and occupancy thereof comply in all material respects with all Legal Requirements, including, without limitation, zoning ordinances, building codes, land use and environmental laws (except with respect to the Violations), laws relating to the disabled (including, but not limited to, the Americans With Disabilities Act of 1990, as amended) and other similar laws; (d) the Property is served by all utilities (including, but not limited to, public water and sewer systems) required for the current or contemplated use thereof; (e) all utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service; (f) all public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all weather and are physically and legally open for use by the public; (g) the Property is in good repair and free of any material damage, waste or defective condition, and to Borrower's knowledge, free from material damage caused by fire, water, wind or other casualty or any previous damage to the Property has been fully restored; (h) all costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full or are being paid in full out of the proceeds of the Loan pursuant to the closing statement prepared by Lender; (i) all liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and comply in all material respects with all Legal Requirements; (j) all Improvements lie within the boundary of the Land; (k) no Condemnation or other similar proceeding has been commenced or, to Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property; (l) the Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property; (m) there are no pending or, to Borrower's knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor, to Borrower's knowledge, are there any contemplated improvements to the Property that may result in such special or other assessments; (n) the Property is used exclusively for hotel purposes and other appurtenant and related uses; (o) no portion of the Property has been or will be purchased with proceeds of any illegal activity and, to Borrower's knowledge, there are no illegal activities at the Property; and (p) Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which Borrower or the Property is bound.

    3.1.7   <u>Leases</u>. (a) The rent roll attached hereto as <u>Schedule III</u> is true, correct and complete in all material respects and the Property is not subject to any Leases other than the Leases described in <u>Schedule III</u>; (b) the Leases identified on <u>Schedule III</u> are in full force and effect and there are no defaults thereunder by any party thereto and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder; (c) the copies of the Leases delivered to Lender are true, correct and complete, and there are no oral agreements with respect

{00979456;7}

-21-

thereto; (d) no Rent (including security or other deposits) has been paid more than two (2) months in advance of its due date; (e) all work to be performed by the landlord under each Lease has been performed as required and has been accepted by the applicable Tenant; (f) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by the landlord to any Tenant has already been received by such Tenant; (g) all security or other deposits are being held in accordance with the applicable Leases and all applicable Legal Requirements; (h) Borrower has no knowledge of any notice of termination or default with respect to any Lease; (i) Borrower has not assigned or pledged any of the Leases, the rents or any interest therein except to Lender; (j) no Tenant or other Person has an option, right of first refusal or offer or any other preferential right to purchase all or any portion of, or interest in, the Property; (k) no Tenant has any right or option for additional space in the Improvements; (l) to Borrower's knowledge, no Tenant has assigned its Lease or sublet all or any portion of the premises demised thereby; (m) except as set forth in the Leases, no Tenant has the right to terminate its Lease prior to expiration of the stated term of such Lease; (n) intentionally omitted; and (o) all existing Leases are subordinate to the Security Instrument either pursuant to their terms or a recorded subordination agreement. The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, as more particularly set forth therein. No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.

3.1.8   <u>Solvency</u>.  Borrower is solvent, has received reasonably equivalent value for entering into this Agreement and the other Loan Documents, and, immediately after the Loan is made, will have sufficient working capital, including cash flow from the Property or other assets, not only to adequately maintain the Property, but also to pay all of Borrower's outstanding debts as they come due. No petition under any state or federal bankruptcy or insolvency laws has ever been filed against Borrower, any SPC Party, Guarantor or any of their respective shareholders, partners, members or non-member managers that, directly or indirectly, own ten percent (10%) or more of the legal, beneficial or economic interests in Borrower, any SPC Party or Guarantor. Neither Borrower, any SPC Party, Guarantor, nor any of their respective shareholders, partners, members or non-member managers that, directly or indirectly, own ten percent (10%) or more of the legal, beneficial or economic interests in Borrower, any SPC Party or Guarantor is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's or such Person's assets or properties.

3.1.9   <u>Financial Information</u>.  All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of the Property or otherwise in connection with the Loan (i) are true, correct and complete in all material respects, and (ii) accurately represent the financial condition of Borrower and the Property, as applicable, as of the date of such reports. Borrower has no liabilities or other obligations that arose or accrued prior to the date hereof that, either individually or in the aggregate, could have a Material Adverse Effect. Borrower has no known contingent liabilities that, either individually or in the aggregate, could have a Material Adverse Effect. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower from that set forth in said financial statements.

3.1.10   <u>Not a Foreign Person</u>.  Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

3.1.11   <u>Filing and Recording Taxes</u>.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid.

3.1.12  <u>Franchise Agreement</u>.  There is no Franchise Agreement with respect to the Property.

3.1.13  <u>Management Agreement</u>.  The Management Agreement is in full force and effect and there is no default thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.

3.1.14  <u>Material Agreements and Operating Agreement</u>.  Each Material Agreement and Operating Agreement is in full force and effect and neither Borrower nor, to Borrower's knowledge, any other party to any Material Agreement or Operating Agreement, is in default thereunder, and to Borrower's knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default under any Material Agreement or Operating Agreement. Borrower has delivered true, correct and complete copies of the Material Agreements (including all amendments and supplements thereto) to Lender.

3.1.15  <u>ERISA Compliance</u>.  As of the date hereof and throughout the term of the Loan, (i) Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA; (ii) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA; (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA; and (iv) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans.  Borrower shall deliver to Lender such certifications or other evidence as requested by Lender from time to time of Borrower's compliance with the foregoing representations and covenants.

3.1.16  <u>Business Purposes</u>.  The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

3.1.17  <u>Taxes</u>.  Borrower has filed all federal, State, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it.  Borrower knows of no basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

3.1.18  <u>OFAC</u>.  Borrower represents and warrants that neither Borrower, Guarantor, or any of their respective Affiliates or, to Borrower's knowledge, any other Person owning a direct or indirect equity interest in Borrower or, if Guarantor is not a natural Person, Guarantor, is a Prohibited Person, and Borrower, Guarantor, and their respective Affiliates and, to Borrower's knowledge, each other Person owning a direct or indirect equity interest in Borrower or, if Guarantor is not a natural Person, Guarantor, are in compliance in all material respects with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury and the Patriot Act.

3.1.19  <u>Intentionally Omitted</u>.

3.1.20  <u>No Change in Facts or Circumstances; Disclosure</u>.  No information contained in this Agreement, the other Loan Documents, or any written statement or document furnished by or on behalf of Borrower in connection with the Loan or pursuant to the terms of this Agreement or any other Loan Document contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. There is no fact or circumstance presently known to Borrower which has not been disclosed to Lender and which could have a Material Adverse Effect. All information submitted by and on behalf of Borrower to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan and all statements of fact made by or on behalf of Borrower in this Agreement or in any other Loan Document, are true, correct and complete in all material respects.  There has been no material adverse change in any condition, fact, circumstance or event that would make any such information or statement of fact inaccurate, incomplete or otherwise misleading in any material respect or that otherwise has or could have a Material Adverse Effect.

3.1.21  <u>Intentionally Omitted</u>.

3.1.22  <u>Intentionally Omitted</u>.

3.1.23  <u>Discounted Payoff</u>. In the event that proceeds from the Loan are being used directly or indirectly to pay off or refinance any mortgage, mezzanine or other similar debt (in whole or in part) that is in default or is the subject of a discounted payoff, Borrower hereby represents and warrants to Lender that each of Borrower, Guarantor and each of their respective and applicable Affiliates (including the borrower(s) of such debt) has complied with all the terms and conditions of any documentation or agreement relating to such default or discounted payoff and has provided to the holder of such debt all information and documentation relating to the Property, Borrower, Guarantor and each of their respective and applicable Affiliates (including the borrower(s) of such debt) (i) required to be so provided and (ii) necessary for the holder of such debt to make an informed decision as to any discounted payoff amount.

3.1.24  <u>Union/Collective Bargaining Agreements</u>. There are no: (i) collective bargaining agreements and/or other labor agreements, including, without limitation, with respect to any unions, to which Borrower or the Property, or any portion thereof, is a party or by which either is or may be bound; (ii) employment, profit sharing, deferred compensation, bonus, stock option, stock purchase, pension, retainer, consulting, retirement, health, welfare, or incentive plans and/or contracts to which Borrower or the Property, or any portion thereof is a party, or by which either is or may be bound; or (iii) plans and/or agreements under which "fringe benefits" (including, but not limited to, vacation plans or programs, and related or similar dental or medical plans or programs, and related or similar benefits) are afforded to employees of Borrower or the Property, or any portion thereof. Borrower has not violated any applicable laws, rules and regulations relating to the employment of labor, including those relating to wages, hours, collective bargaining and the payment and withholding of taxes and other sums as required by appropriate Governmental Authorities.

**Section 3.2**   <u>Survival of Representations</u>. Borrower agrees that all of the representations and warranties of Borrower set forth in <u>Section 3.1</u> and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower.

**IV.**   **BORROWER COVENANTS**

**Section 4.1**   <u>Covenants</u>. Borrower hereby covenants and agrees with Lender that:

4.1.1  <u>Existence; Compliance with Legal Requirements</u>. (a) Borrower will continuously maintain its existence and its rights to do business in the State together with its franchises and trade names, and will keep in full force and effect all material licenses, permits and applicable governmental authorizations necessary for the continued use and operation of the Property. Without limitation to the foregoing, Borrower shall (i) promptly comply and cause Guarantor and the Property to comply with all existing and future Legal Requirements, (ii) from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Legal Requirements or is exempt from compliance with Legal Requirements (hereinafter defined), (iii) give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements, and (iv) take appropriate measures to prevent and will not engage in or knowingly permit any illegal activities at the Property. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold,

forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security or part thereof, as necessary to cause compliance with such Legal Requirement at any time when, in the judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

4.1.2   <u>Taxes and Other Charges</u>.  Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable (provided, however, Borrower's obligation to directly pay Taxes shall be suspended for so long as Borrower complies with the terms and provisions of <u>Section 6.2</u>). Borrower shall furnish to Lender receipts, or other evidence for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Borrower is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid by Lender pursuant to <u>Section 6.2</u>).  Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property.  After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; and (vi) Borrower shall furnish such security as may be required in the proceeding, or as may reasonably be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon.  Lender may apply such security or part thereof held by Lender at any time when, in the judgment of Lender, the validity or applicability of such Tax or Other Charges is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien the Security Instrument being primed by any related Lien.

4.1.3   <u>Maintenance of Property</u>.  Borrower shall cause the Property to be maintained in a good and safe condition and repair.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of the Security Instrument. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof.  If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender. Borrower shall not suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) with any portion of the Property which may be deemed to constitute personal property, or any other action or procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed

or levied or charged to the Property or any portion thereof. The Property shall be used only for hotel use and other appurtenant and related uses (including, without limitation, bars and restaurants), and for no other use without the prior written consent of Lender.

4.1.4   Financial Reporting. (a) Borrower shall keep and maintain, or shall cause to be kept and maintained, in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property. All financial statements delivered to Lender pursuant to this Section 4.1.4 shall be prepared in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) and consistently applied.

(b)      Prior to a Securitization, Borrower shall furnish, or cause to be furnished, to Lender on or before twenty (20) days after the end of each calendar month the following items, accompanied by an Officer's Certificate stating that such items are true, correct and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) an occupancy report for the subject month, including an average daily rate, and any franchise inspection reports received by Borrower during such month; (ii) monthly and year-to-date operating statements prepared for such month, noting Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income, Net Cash Flow and such other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such month, all in form satisfactory to Lender; and (iii) a calculation reflecting the Debt Service Coverage Ratio as of the last day of such month for the immediately preceding twelve (12) month period. On or before thirty (30) days after the end of each calendar month, Borrower also will furnish, or cause to be furnished, to Lender the most current Smith Travel Research Reports then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property.

(c)      Borrower shall furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items, accompanied by an Officer's Certificate stating that such items are true, correct and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) an occupancy report for the subject quarter, including an average daily rate; (ii) (A) a balance sheet for Borrower as of the last day of such quarter and (B) quarterly and year-to-date operating statements prepared for such quarter, noting Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income, Net Cash Flow and such other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such quarter, all in form satisfactory to Lender; and (iii) a calculation reflecting the Debt Service Coverage Ratio as of the last day of such quarter for such quarter and for the last four quarters.

(d)      Borrower shall furnish, or cause to be furnished, to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements audited by an independent certified public accountant acceptable to Lender in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender) covering the Property for such Fiscal Year and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower. Such statements shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual Gross Income from Operations, Operating Expenses, Capital Expenditures, Net Operating Income and Net Cash Flow. Borrower's annual financial statements shall be accompanied by (i) an Officer's

Certificate stating that each such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property being reported upon and has been prepared in accordance with the Uniform System of Accounts and reconciled in accordance with GAAP (or such other accounting basis acceptable to Lender), and (ii) occupancy statistics for the Property.

(e)       Each such financial statement shall be in scope and detail reasonably satisfactory to Lender and certified by the chief financial officer or representative of Borrower. Any reports, statements or other information required to be delivered under this Agreement shall be delivered (i) in paper form, (ii) on a diskette or other portable media format, or (iii) if requested by Lender and within the capabilities of Borrower's data systems without change or modification thereto, in electronic form reasonably acceptable to Lender. Lender shall have the right from time to time at all times during normal business hours to examine such books, records and accounts at the office of Borrower or other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. After the occurrence of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(f)       For the partial year period commencing on the date hereof, and for each Fiscal Year thereafter, Borrower shall submit to Lender an annual operating budget presented on a monthly basis consistent with the quarterly and annual operating statements described above for the Property, including cash flow projections for the upcoming year, and all proposed Capital Expenditures at least fifteen (15) days prior to the start of each Fiscal Year.

(g)       Borrower shall furnish to Lender, within five (5) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(h)       If Borrower fails to provide to Lender the financial statements and other information specified in this Section 4.1.4 within the respective time period specified, then, in addition to any other rights and remedies Lender may have herein or under applicable law, Borrower shall pay to Lender a fee in the amount of $1,000 if such failure continues for fifteen (15) days after notice thereof (provided, however, that Lender shall not be required to give notice of such failure more than twice in any twelve (12)-month period) and again upon the expiration of each 30-day period thereafter until compliance is achieved, which amounts shall constitute a portion of the Obligations and, if unpaid, shall accrue interest at the Default Rate.

4.1.5   Litigation.   Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened against the Property, Borrower or any Guarantor which, if adversely determined, could have a Material Adverse Effect.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

4.1.6   Leasing Matters.  (a) All Leases and all renewals of Leases executed after the date hereof shall (i) provide for economic terms, including rental rates, comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms, (iii) have a term of not less than three (3) years (unless Lender approves in writing a shorter term), (iv) have a term of not more than fifteen (15) years, including all extensions and renewals (unless Lender approves in writing a longer term), (v) provide that such Lease is subordinate to the Security Instrument and the Assignment of Leases and that the Tenant thereunder will attorn to Lender and any purchaser at a

{00979456;7}

-27-

foreclosure sale, (vi) be arms-length transactions with bona fide, independent third party tenants, unless Lender otherwise approves the tenant, which approval shall not be unreasonably withheld, conditioned or delayed, (vii) be written substantially in accordance with a standard form of Lease which shall have been approved in writing by Lender (subject to any commercially reasonable changes made in the course of negotiations with the applicable Tenant), (viii) not be with any Affiliate of Borrower, Guarantor or Manager, unless Lender otherwise approved the tenant, which approval shall not be unreasonably withheld, conditioned or delayed, and (ix) not contain any option to purchase, any right of first option to purchase, any right of first refusal to purchase; provided that, in connection with renewals of Leases existing on the date hereof, any applicable term that would otherwise breach the requirements set forth in this Section 4.1.6(a) shall be permitted to the extent necessary to implement a renewal term expressly contained in the applicable Lease and with respect to which Borrower has no discretion.

(b)      Borrower (i) shall perform the obligations which Borrower is required to perform under the Leases; (ii) shall enforce in a commercially reasonable manner the obligations to be performed by the Tenants thereunder (short of termination thereof); (iii) shall promptly furnish to Lender any notice of default or termination received by Borrower from any Tenant, and any notice of default or termination given by Borrower to any Tenant; (iv) shall not collect any Rents for more than one (1) month in advance of the time when the same shall become due, except for bona fide security deposits; (v) shall not enter into any ground Lease or master Lease of any part of the Property; (vi) shall not further assign or encumber any Lease or the Rents (except as contemplated by the Loan Documents); (vii) shall not, except with Lender's prior consent, cancel or accept surrender or termination of any Lease, provided, however, any Lease other than a Major Lease may be terminated in the event of a bona fide, material event of default by the Tenant thereunder; and (viii) shall not, except with Lender's prior consent, modify or amend any Lease (except, solely with respect to Leases that are not Major Leases, for minor modifications and amendments entered into in the ordinary course of business, consistent with prudent property management practices, not affecting the economic terms of the applicable Lease, and which result in a Lease in conformance with the provisions of Section 4.1.6(a) above). Any action in violation of clause (v), (vi), (vii) or (viii) of this Section 4.1.6(b) shall be void at the election of Lender.

(c)      All Major Leases and all renewals, modifications and amendments thereof (other than renewals, modifications and amendments strictly limited to the implementation of options or rights expressly contained in Major Leases and with respect to which Borrower has no discretion as to the terms thereof) executed after the date hereof shall be subject to Lender's prior approval, which shall not be unreasonably conditioned, delayed or withheld.

(d)      Borrower shall not permit or consent to any assignment or sublease of any Major Lease without Lender's prior approval, which shall not be unreasonably conditioned, delayed or withheld (other than any assignment or sublease expressly permitted under a Major Lease pursuant to a unilateral right of Tenant thereunder not requiring the consent of Borrower).

(e)      Upon Borrower's request and at Borrower's sole cost and expense, Lender shall execute and deliver its standard form of subordination, non-disturbance and attornment agreement to Tenant under any future Major Lease approved or deemed approved by Lender, with such commercially reasonable changes as may be requested by such Tenant and which are acceptable to Lender.

(f)      Borrower shall pay or reimburse Lender for all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Lender in connection with the review of any matter requiring Lender's consent under this Section 4.1.6.

{00979456;7}

-28-

(g)     Within ten (10) Business Days after Lender's request, Borrower shall furnish to Lender a statement of all tenant security or other deposits and copies of all Leases not previously delivered to Lender, certified as being true, correct and complete.

(h)     All security deposits of Tenants, whether held in cash or any other form, shall be held in compliance with all applicable Legal Requirements and shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower at such commercial or savings bank or banks as may be reasonably satisfactory to Lender.  Borrower shall, upon request, provide Lender with evidence reasonably satisfactory to Lender of Borrower's compliance with the foregoing. Following the occurrence and during the continuance of any Event of Default, Borrower shall, upon Lender's request, if permitted by any applicable Legal Requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Property, to be held by Lender subject to the terms of the Leases.

4.1.7   Alterations.   Lender's prior approval shall be required in connection with any alterations to the Property (a)(i) that could have a Material Adverse Effect, (ii) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold, or (iii) that could adversely affect any structural component of any Improvements, any utility or HVAC system at the Property or the exterior of any building constituting a part of any Improvements or (b) any alterations to the Property during the continuation of any Event of Default.  Any alteration to the Property shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements.  If the total unpaid amounts incurred and to be incurred with respect to such alterations to the Property shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents, at Borrower's option, any of the following:  (A) cash, (B) letters of credit (in form and from an issuer acceptable to Lender), or (C) U.S. Obligations.  Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements (other than such amounts to be paid or reimbursed by Tenants under the Leases; provided that the applicable Leases shall be in full force and effect) over the Alteration Threshold, and, at Lender's option, Lender shall have the right to apply such security from time to time to pay for such alterations.   Upon substantial completion of any alteration to the Property, Borrower shall provide evidence reasonably satisfactory to Lender that (1) such alteration was constructed in accordance with all applicable Legal Requirements, (2) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with such alteration have been paid in full and have delivered unconditional releases of liens, and (3) all licenses and permits necessary for the use, operation and occupancy of the Improvements have been issued, provided that, if any such license or permit is temporary in nature, Borrower shall diligently pursue procuring a permanent license or permit from the applicable Governmental Authority.

4.1.8   Management Agreement.  (a) Borrower shall cause the Property to be operated in accordance with the Management Agreement. Borrower shall (i) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (ii) promptly notify Lender of any default under the Management Agreement of which it is aware, (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, report and estimate received by it under the Management Agreement and (iv) promptly enforce the performance and observance of all of the terms, covenants and conditions required to be performed and/or observed by Manager under the Management Agreement, in a commercially reasonable manner. If Borrower shall default in the performance or observance of any term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder, under the other Loan Documents or under the Management

Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed in all material respects. Borrower shall not, without prior consent of Lender, (1) surrender, terminate, cancel, modify or amend the Management Agreement; provided that Borrower may, without Lender's consent, (A) terminate the Management Agreement in the event of a bona fide, material event of default by the Manager under the management Agreement, provided Borrower replaces Manager with a Qualified Manager in accordance with this Agreement, or (B) replace Manager with a Qualified Manager pursuant to a Replacement Management Agreement or extend the term of any existing Management Agreement, in each case with no increase to the management fees payable for the Property, (2) reduce or consent to the reduction of the term of the Management Agreement, (3) increase or consent to the increase of the amount of any fees or other charges under the Management Agreement, or (4) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect. In connection with the replacement of Manager with a Qualified Manager, Borrower shall execute and cause Qualified Manager to execute an assignment of management agreement and subordination of management fees in the form then used by Lender. In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly enter into a Replacement Management Agreement with a Qualified Manager. Upon the occurrence and during the continuation of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior consent of Lender.

(b)     Without limitation to the foregoing, if (i) an Event of Default has occurred and is continuing, (ii) Manager shall be in default under the Management Agreement beyond any applicable notice and cure period, (iii) Manager shall become insolvent or a debtor in any Bankruptcy Action, (iv) at any time Manager has engaged in gross negligence, fraud, willful misconduct or misappropriation of funds, and/or (v) at any time the Debt Service Coverage Ratio (based upon the trailing twelve (12) month period immediately preceding the date of such determination) is less than 1.10 to 1.00, Borrower shall, at Lender's request, terminate the Management Agreement and replace Manager with a Qualified Manager pursuant to a Replacement Management Agreement, it being understood and agreed that the management fee for such Qualified Manager shall not exceed then prevailing market rates.

4.1.9   Hotel Covenants.

(a)     Borrower shall cause the hotel located on the Property to be operated as a boutique hotel and other appurtenant and related uses, in substantially the same manner as operated as of the Closing Date.

(b)     Borrower shall not enter into a Franchise Agreement or similar agreement in respect of the hotel located on the Property without the prior written consent of Lender (which may be granted or withheld by Lender in its sole and absolute discretion) and, following a Securitization, Borrower's delivery to Lender of a Rating Agency Confirmation.

(c)     Without in any way limiting the covenants set forth in the Loan Documents, Borrower shall: (i) cause the hotel located on the Property to be operated, repaired and maintained as a well-maintained "first-class hotel," which shall mean a hotel providing amenities, services and facilities substantially equivalent or superior to hotels of similar average room rate and targeted market segment from time to time operating in the same or comparable geographic area of the Property, taking into consideration the age and location of the hotel located on the Property, and (ii) maintain inventory in amounts sufficient to meet the hotel industry standard for hotels comparable to the hotel located on the Property and at levels sufficient for the operation of the hotel located on the Property at full occupancy levels.

{00979456;7}

4.1.10  Intentionally Omitted.

4.1.11  Performance of Other Agreements.  Borrower shall observe and perform each and every material term to be observed or performed by Borrower pursuant to the terms of any Operating Agreements and Material Agreements.  Without limitation to the foregoing, Borrower shall (a) give prompt notice to Lender of any notice received by Borrower under any of the Material Agreements or Operating Agreements, together with a complete copy of any such notice, (b) enforce, short of termination thereof, the performance and observance of each and every material term, covenant and provision of the Material Agreements or Operating Agreements to be performed or observed, if any, (c) not terminate or amend any of the terms or provisions of any Material Agreement or Operating Agreement, without the prior written consent of Lender, provided, however, any Material Agreement may be terminated in the event of a bona fide, material event of default by the counterparty thereunder, and (d) not enter into any Material Agreement or Operating Agreement without Lender consent, which shall not be unreasonably withheld, conditioned or delayed in the case of a Material Agreement; provided, however, Lender's consent shall not be required with respect to (x) the execution of a Material Agreement on an arm's length basis and on commercially reasonable terms, (y) a termination of any Material Agreement if the other party thereto is in material default and the termination of such agreement would be commercially reasonable or (z) any amendment or waiver of any term or provision of any Material Agreement entered on an arm's length basis and on commercially reasonable terms.  In the event a Material Agreement terminates by its terms, with Lender's consent or pursuant to clause (z), Borrower shall enter into a replacement thereof that is negotiated on arm's length basis and contains commercially reasonable terms (except that no replacement shall be required where the related service or subject matter is no longer required or relevant to the use, operation or enjoyment of the Property).  Borrower shall notify Lender in the event Borrower does not replace the terminated Material Agreement.

4.1.12  Transfers.  (a)  Without the prior consent of Lender, neither Borrower nor any Restricted Party shall do any of the following (each, a "**Transfer**"): sell, transfer, convey, assign, mortgage, pledge, encumber, alienate, grant a Lien on, grant any option with respect to or grant any other interest in the Property, any part thereof or any interest therein (including any legal, beneficial or economic interest in Borrower or any Restricted Party), directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record, other than Permitted Transfers.

(b)      A Transfer shall include (i) an installment sales agreement wherein Borrower agrees to sell the Property, any part thereof or any interest therein for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if Borrower or any Restricted Party is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock such that such corporation's stock shall be vested in a party or parties who are not now stockholders or any change in the control of such corporation, except pursuant to a Permitted Transfer; (iv) if Borrower or any Restricted Party is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a partner, joint venturer, manager or member, the voluntary or involuntary transfer of any partnership, joint venture, membership or manager interest or any change in the control of such limited or general partnership, joint venture or limited liability company, except pursuant to a Permitted Transfer; (v) if Borrower or any Restricted Party is a trust, the change or removal of any trustee of such trust, the voluntary or involuntary transfer of the legal or beneficial interest in such trust or the creation or issuance of new legal or beneficial interests and (vi) the transfer, assignment or pledge of any distribution or dividends of a stockholder, partner,

venturer, member, manager or other beneficial owner of a Restricted Party, except pursuant to a Permitted Transfer.

(c)     Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder or under the other Loan Documents in order to declare the Debt immediately due and payable upon a Transfer (other than a Permitted Transfer) without Lender's prior consent. This provision shall apply to every Transfer regardless of whether voluntary or not, and whether or not Lender has consented to any previous Transfer.

(d)     No consent to any assumption of the Loan shall occur on or before the first (1st) anniversary of the date hereof. Thereafter, Lender's consent to a Transfer of the Property and the assumption of the Loan shall not be unreasonably withheld after consideration of all relevant factors and provided that the following conditions are satisfied: (i) Lender shall have received a notice from Borrower requesting Lender's consent to such Transfer not less than sixty (60) days prior to the proposed date of such Transfer; (ii) no Event of Default shall have occurred and remain outstanding; (iii) the proposed transferee ("**Transferee**") shall be a Single Purpose Entity; (iv) the Organizational Documents of Transferee and any managing member or general partner thereof shall be reasonably satisfactory to Lender; (v) neither any Transferee's Sponsor, Transferee nor any other Person owned or controlled, directly or indirectly, by Transferee's Sponsors shall have been a party to any Bankruptcy Action or taken advantage of any Bankruptcy Law or any law for the benefit of debtors within seven (7) years prior to the date of the proposed Transfer; (vi) neither any Transferee's Sponsor, Transferee nor any other Person owned or controlled, directly or indirectly, by Transferee's Sponsors shall have defaulted under its obligations with respect to any Indebtedness in a manner which is not reasonably acceptable to Lender; (vii) there shall be no material litigation or regulatory action pending or threatened against any Transferee's Sponsor, Transferee or any other Person owned or controlled, directly or indirectly, by Transferee's Sponsors which is not reasonably acceptable to Lender; (viii) Transferee and Transferee's Sponsors shall, as of the date of such Transfer, have an aggregate net worth and liquidity reasonably satisfactory to Lender in accordance with commercially reasonable standards (it being acknowledged that the foregoing shall not limit Lender's rights under clause (xvi) below); (ix) Transferee and Transferee's Sponsors (together with Transferee's proposed property manager) shall be experienced owners and operators of properties similar in location, size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably satisfactory to Lender (it being understood and agreed that Lender reserves the right to approve Transferee without approving its proposed property manager); (x) if the Management Agreement will be terminated as a result of such Transfer, the Property shall be managed by a Qualified Manager in accordance with a Replacement Management Agreement; (xi) if a Franchise Agreement is in effect, such Franchise Agreement will remain in full force and effect after giving effect to such Transfer (unless (1) Lender has consented to the termination of such Franchise Agreement in its sole and absolute discretion and (2) a new franchise agreement has been executed with the franchisor under the terminated Franchise Agreement or a new franchisor, which new franchise agreement and franchisor shall be acceptable to Lender in its sole and absolute discretion; (xii) Transferee shall have delivered all agreements, certificates and opinions reasonably required by Lender (including, if applicable, an amendment to Section 8.5 and/or Schedule I hereof to incorporate necessary changes based on differences in the organizational structures of Borrower and Transferee); (xiii) no Event of Default shall occur as a result of such Transfer; (xiv)Transferee shall have assumed all obligations of Borrower under the Loan Documents pursuant to an assumption agreement in form and substance reasonably satisfactory to Lender; (xv) Borrower shall have delivered, at its sole cost and expense, an endorsement to the Title Insurance Policy, as modified by the assumption agreement, as a valid first lien on the Property and naming Transferee as owner of the Property, which endorsement shall insure that, as of the date of the

{00979456;7}

recording of the assumption agreement, the Property shall not be subject to any Liens other than those contained in the Title Insurance Policy issued on the date hereof and the Permitted Encumbrances; (xvi) one (1) or more Transferee's Sponsors reasonably acceptable to Lender having (y) control over Transferee and (z) an aggregate net worth and liquidity meeting the requirements set forth in the Guaranty shall (A) have assumed all obligations of Guarantor under the Guaranty and the Environmental Indemnity or (B) have executed a replacement guaranty and a replacement environmental indemnity in form and substance reasonably satisfactory to Lender; (xvii) at Lender's request, Borrower or Transferee, at its sole cost and expense, shall have delivered an Insolvency Opinion reflecting such Transfer reasonably acceptable to Lender and acceptable to the Rating Agencies; (xviii) if required by Lender, Borrower shall have delivered a Rating Agency Confirmation as to such Transfer and Transferee; (xix) the Liquor License shall remain in full force and effect, or, in the event a replacement Liquor Licenses is required on account of the Transfer, Transferee has arranged for a replacement Liquor License to be issued with respect to the Property; (xx) Borrower shall have paid to Lender an assumption fee equal to one quarter of one percent (0.25%) of the Outstanding Principal Balance for the first such Transfer and one percent (1%) of the Outstanding Principal Balance for each such subsequent Transfer; and (xxi) Borrower shall have paid all reasonable out-of-pocket costs and expenses incurred in connection with such Transfer (including reasonable fees and disbursements of Lender's counsel and fees, costs and expenses of the Rating Agencies).

(e)    Notwithstanding anything to the contrary contained in this Section 4.1.12, Lender's consent shall not be required in connection with Transfers of the direct or indirect ownership interests in any Restricted Party (x) that do not result in a Transfer of more than forty-nine percent (49%), in the aggregate, of the direct or indirect ownership interests in Borrower or (y) to an immediate family member (i.e., parents, spouses, siblings, children or grandchildren) of an owner of such interest (or a trust for the benefit of any such person(s)) for estate planning purposes; provided that the following conditions are satisfied: (i) no Event of Default shall have occurred and remain outstanding or shall occur solely as a result of such Transfer, (ii) such Transfer shall not (1) cause the transferee, together with its Affiliates, to acquire control of Borrower, (2) result in any Borrower no longer being controlled by Key Principal, or (3) except in connection with a Transfer described in clause (y) above, cause the transferee, together with its Affiliates, to increase its direct or indirect interest in Borrower to an amount which exceeds forty-nine percent (49%) in the aggregate; (iii) to the extent the transferee owns twenty percent (20%) or more of the direct or indirect interests in Borrower immediately following such Transfer (provided that such Transferee did not own 20% or more of the direct or indirect ownership interests in Borrower as of the Closing Date), Borrower shall deliver, at Borrower's sole cost and expense, customary searches (credit, judgment, lien, bankruptcy, etc.) reasonably acceptable to Lender with respect to such transferee and its Affiliates as Lender may reasonably require, (iv) after giving effect to such Transfer, Key Principal shall continue to own, directly or indirectly, at least fifty-one percent (51%) of all legal, beneficial and economic interests in Borrower, (v) Borrower shall give Lender notice of such Transfer request, together with copies of all instruments effecting such Transfer and copies of any Organizational Documents that Lender shall require, not less than thirty (30) days prior to the proposed date of such Transfer, and (vi) the legal and financial structure of Borrower and the single purpose nature and bankruptcy remoteness of Borrower, after such Transfer, shall satisfy Lender's the then current applicable underwriting criteria and requirements.

(f)    Lender's consent to one Transfer shall not be deemed to be a waiver of Lender's right to require such consent to any future occurrence of same. Any Transfer made in contravention of this Section 4.1.12 shall be null and void and of no force and effect.

(g)     Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses, title search costs and title insurance endorsement premiums) incurred by Lender in connection with the review, approval and/or documentation of any proposed Transfer. If required by Lender, Borrower shall deposit with Lender an amount equal to Lender's anticipated costs and expenses in evaluating any proposed Transfer.

4.1.13  <u>O&M Program</u>.  Borrower hereby represents and warrants that attached hereto as <u>Schedule VII</u> is a true and complete copy of that certain Operations and Maintenance Plan for Asbestos – Containing Materials, dated April 10, 2015, prepared by Nova Consulting Group, Inc. (the "<u>O&M Program</u>"), and Borrower has, as of the date hereof, complied in all material respects with the O&M Program.  Borrower hereby covenants and agrees that, during the term of the Loan, including any extension or renewal thereof, Borrower shall comply in all material respects with the terms and conditions of the O&M Program.

4.1.14  <u>Patriot Act Compliance</u>.   Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering.   Lender shall have the right to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities relating to terrorism and money laundering.  In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, Lender may, at its option, cause Borrower to comply therewith.  At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, any SPC Party or Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Prohibited Person, with the result that the investment in Borrower, any SPC Party or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law, or the Loan made by Lender would be in violation of law, (b) no Prohibited Person shall have any interest of any nature whatsoever in Borrower, any SPC Party or Guarantor, as applicable, with the result that the investment in Borrower, any SPC Party or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower, any SPC Party or Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, any SPC Party or Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law. All costs and expenses incurred by Lender in connection therewith shall be paid by Borrower to Lender, upon demand, with interest at the Default Rate from the date such costs and expenses were incurred to and including the date the reimbursement payment is received by Lender.  All such indebtedness shall be secured by the Security Instrument.

4.1.15  <u>Debt Cancellation</u>.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

4.1.16  <u>Name, Identity, Structure, or Principal Place of Business</u>.  Borrower shall not change its name, identity (including its trade name or names), or principal place of business set forth in the introductory paragraph of this Agreement, without, in each case, first giving Lender thirty (30) days prior written notice.  Borrower shall not change its corporate, partnership or other structure, or the place of its organization as set forth herein, without, in each case, the consent of Lender.  Upon Lender's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or place of organization.

4.1.17  <u>Access to the Property</u>. Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance

{00979456;7}

written notice, subject to the rights of tenants and without undue adverse impact on Borrower's business.

4.1.18  Notice of Default.  Borrower shall promptly advise Lender of the occurrence of any Event of Default of which Borrower has knowledge.

4.1.19  Further Assurances.  Borrower shall, at Borrower's sole cost and expense: (a) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Obligations, as Lender may reasonably require; and (b) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender shall reasonably require from time to time.

4.1.20  Intentionally Omitted.

4.1.21  Estoppel Statement.  (a) After request by Lender, Borrower shall within ten (10) Business Days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of each Note, (ii) the unpaid principal amount of each Note, (iii) the Note A Applicable Interest Rate and the Note B Applicable Interest Rate, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, and (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b)  Borrower shall deliver to Lender, within thirty (30) days after Lender's request, an estoppel certificate from each Tenant under any Lease in form and substance reasonably satisfactory to Lender; provided that (i) Borrower shall only be required to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant, (ii) such estoppel certificate may be in the form required under such Lease, and (iii) Borrower shall not be required to deliver such estoppel certificate from any Tenant more frequently than two (2) times in any calendar year.

4.1.22  Violations.  Borrower (a) shall diligently and in good faith pursue completion of all of the conditions required under applicable Legal Requirements pertaining to the Property, including, without limitation, causing any violations and any outstanding items with respect to the Property (collectively, the "**Violations**") to be completed and/or removed of record, and (b) shall deliver to Lender evidence of such completion and/or removal in form(s) satisfactory to Lender.

4.1.23  Permanent Certificate of Occupancy.  Borrower (a) shall maintain the existing temporary certificate of occupancy, which expires June 25, 2015 (the "**TCO**"), and shall cause the TCO to be continuously renewed at all times until a new, permanent certificate of occupancy is obtained for the Property (the "**New PCO**"), (b) shall diligently and in good faith pursue the issuance of the New PCO, and (c) shall deliver to Lender copies of each updated TCO as and when issued and deliver to Lender a copy of the New PCO upon its issuance.

4.1.24  Liquor License(s).  (a)  Borrower (i) shall cause Licensee and/or its successors and/or assigns to maintain the Liquor License(s) and shall cause each Liquor License to be continuously renewed at all times, and (ii) shall deliver or shall cause to be delivered to Lender copies of each updated Liquor License as and when issued.

(b)  Notwithstanding the foregoing, upon prior written notice to Lender, Borrower shall be permitted to make application with the applicable Governmental Authorities to have the Liquor License transferred to Borrower or to an Affiliate of Borrower that is controlled by Key Principal.

(i)  In the event Borrower elects to transfer the Liquor License to Borrower, upon the transfer of the Liquor Licenses to Borrower, the terms and provisions of the Liquor License Cooperation agreement shall be of no further force and effect.  Borrower shall keep Lender appraised of the progress with respect to such transfer and shall provide Lender with

copies of the replacement Liquor Licenses upon receipt.   Following the re-issuance of the Liquor License in Borrower's name, Borrower shall keep such Liquor Licenses in full force and effect and, during the continuance of an Event of Default, Borrower will, at the cost of Borrower, and without expense to Lender, execute, acknowledge and deliver all such writings and take any all further actions necessary or reasonably requested by Lender to transfer the Liquor Licenses and any other required licenses or permits with respect to the Property into the name of Lender or its designee. To the extent any such licenses (including, without limitation, the Liquor License) cannot be so transferred to Lender or its designee under applicable law, Borrower shall continue to hold and maintain such licenses, including, without limitation, the Liquor License in full force and effect for the benefit of Lender until such time as Lender can obtain such in its own name or the name of a designee.   Without limiting the foregoing, Borrower shall execute such interim management, leasing or other agreements (which shall be in form and substance (a) reasonably satisfactory to Lender and the applicable licensing authorities and (b) reasonably satisfactory to Borrower, which such approval by Borrower shall not be unreasonably withheld, conditioned or delayed) as may be required for Lender to continue operations at the Property pursuant to such licenses until such licenses are transferred to, or are otherwise obtained by, Lender or its designee.   Borrower constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution to complete or undertake any action required of Borrower under this Section in the name of Borrower in the event Borrower fails to do the same; provided, however, Lender shall not exercise such power of attorney without five (5) Business Days prior written notice to Borrower.

(ii)    In the event Borrower elects to transfer the Liquor License to an Affiliate of Borrower (any such Affiliate, the **"Affiliate Licensee Transferee"**), upon the transfer of the Liquor Licenses to such Affiliate Licensee Transferee, the terms and provisions of the Liquor License Cooperation agreement shall be of no further force and effect.   Borrower shall deliver to Lender an organizational chart of such Affiliate Licensee Transferee together with the organizational documents of such Affiliate Licensee Transferee which shall confirm that the Affiliate Licensee Transferee is owned at least 51% by Key Principal and controlled by Key Principal.   Borrower shall keep Lender appraised of the progress with respect to such transfer and shall provide Lender with copies of the replacement Liquor Licenses upon receipt.   Affiliate Licensee Transferee shall enter into a cooperation agreement with Lender, in form and substance substantially similar to the Liquor License Cooperation Agreement which shall, among other things, provide for the cooperation of Affiliate Licensee Transferee following an Event of Default (such agreement a **"Replacement Liquor License Cooperation Agreement"**). Following the re-issuance of the Liquor License in Affiliate Licensee Transferee's name, Borrower shall cause such Affiliate Licensee Transferee to keep such Liquor Licenses in full force and effect and, during the continuance of an Event of Default, Borrower shall cause such Affiliate Licensee Transferee, at the cost of Borrower, and without expense to Lender, execute, acknowledge and deliver all such writings and take any all further actions necessary or reasonably requested by Lender to transfer the Liquor Licenses and any other required licenses or permits with respect to the Property into the name of Lender or its designee. To the extent any such licenses (including, without limitation, the Liquor License) cannot be so transferred to Lender or its designee under applicable law, Affiliate Licensee Transferee shall continue to hold and maintain such licenses, including, without limitation, the Liquor License in full force and effect for the benefit of Lender until such time as Lender can obtain such in its own name or the name of a designee.   Without limiting the foregoing, Borrower shall cause such Affiliate Licensee Transferee to execute such interim management, leasing or other agreements (which shall be in form and substance (a) reasonably satisfactory to Lender and the applicable licensing authorities and (b) reasonably satisfactory to Borrower and to Affiliate Licensee Transferee, which such approval by Borrower and Affiliate Licensee Transferee shall not be unreasonably withheld, conditioned or delayed) as may be required for Lender to continue operations at the Property

pursuant to such licenses until such licenses are transferred to, or are otherwise obtained by, Lender or its designee. Such Replacement Liquor License Cooperation Agreement shall provide that Affiliate licensee Transferee shall constitute and appoint Lender its true and lawful attorney-in-fact with full power of substitution to complete or undertake any action required of Affiliate Licensee Transferee under this Section in the name of such Affiliate Licensee Transferee in the event such Affiliate Licensee Transferee fails to do the same; provided, however, Lender shall not exercise such power of attorney without five (5) Business Days prior written notice to Borrower and such Affiliate Licensee Transferee.

4.1.25   Required Repairs.   Borrower shall perform the repairs at the Property as more particularly set forth on Schedule IV hereto (such repairs, collectively, the "**Required Repairs**"), and shall complete each of the Required Repairs on or before the respective deadline as set forth on Schedule IV.   Upon completion of the Required Repairs, Borrower shall deliver to Lender a certification and other evidence reasonably satisfactory to Lender, that confirms the completion of the Required Repairs and confirms that such completion is in lien free, in a good workmanlike manner and in accordance with all applicable Legal Requirements.

## V.   INSURANCE; CASUALTY; CONDEMNATION

**Section 5.1**   Insurance.   (a)   Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(i)   comprehensive all risk insurance (including wind and named storms) on the Improvements and the personal property at the Property (A) in an amount equal to one hundred percent (100%) of the "full replacement cost" of the Property, which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Improvements and personal property at the Property waiving all co-insurance provisions; (C) providing for no deductible in excess of Ten Thousand and No/100 Dollars ($10,000) for all such insurance coverage, except for wind/named storms and earthquake which may provide for a deductible of five percent (5%) of the total insurable value of the Property; and (D) if any of the Improvements or the use of the Property shall at any time constitute a legal non-conforming structure or use, containing "law and ordinance" coverage including coverage for loss of the undamaged portion of the Improvements, demolition and increased costs of construction in an amount acceptable to Lender.   In addition, Borrower shall obtain:   (1) if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area," flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, plus such excess amount as Lender shall require; and (2) if the Property is located in seismic zone 3 or 4 and the PML/SEL of the Property exceeds twenty percent (20%), earthquake insurance in amounts and in form and substance satisfactory to Lender, provided that the insurance pursuant to clauses (1) and (2) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this Section 5.1(a)(i);

(ii)   broad form commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with an occurrence limit of not less than One Million and No/100 Dollars ($1,000,000) and an aggregate limit of not less than Two Million and No/100 Dollars ($2,000,000); (B) to continue at not less than the aforesaid limit until required to be changed by Lender by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) contractual liability for all insured contracts; and

(5) contractual liability covering the indemnities contained in Article 9 of the Security Instrument to the extent the same is available;

(iii)   business income insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by insurance pursuant to Sections 5.1(a)(i), (iv), (vi), (xi) and (xii) for a period commencing at the time of loss for such length of time as it takes to repair or replace with the exercise of due diligence and dispatch or the expiration of eighteen (18) months, whichever first occurs, and notwithstanding that the Policy may expire prior to the end of such period; (C) in an amount equal to one hundred percent (100%) of the projected gross income (less non-continuing expenses) from the Property for a period of eighteen (18) months; and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and the Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period.  The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income (less non-continuing expenses) from the Property for the succeeding twelve (12) month period.  All proceeds payable to Lender pursuant to this Section 5.1(a)(iii) shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligation to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)   at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the property and liability coverage forms do not otherwise apply, (A) commercial general liability and umbrella liability insurance covering claims related to construction, repair and alteration at the Property not covered by or under the terms or provisions of the commercial general liability insurance and umbrella liability insurance policies required under this Section 5.1; and (B) the insurance provided for in Section 5.1(a)(i) above written in a so-called builder's risk completed value form in amounts and with deductibles, terms and conditions required by Lender (1) on a non-reporting basis, (2) covering all risks required to be insured against pursuant to Sections 5.1(a)(i), (iii), (vi), (xi) and (xii), (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions;

(v)   workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least One Million and No/100 Dollars ($1,000,000) per accident and per disease per employee, and One Million and No/100 Dollars ($1,000,000) for disease aggregate (if applicable);

(vi)   comprehensive boiler and machinery insurance in amounts required by Lender and on terms consistent with the insurance required under Section 5.1(a)(i) above (if applicable);

(vii)   umbrella liability insurance in addition to primary coverage in an amount not less than Twenty Million and No/100 Dollars ($20,000,000) per occurrence on terms consistent with the insurance required under Section 5.1(a)(ii) and, if applicable, (viii);

(viii)   commercial auto liability coverage for all owned and non-owned vehicles, including rented and leased vehicles, containing minimum limits per occurrence of One Million and No/100 Dollars ($1,000,000) (if applicable);

(ix)   liquor liability insurance or other liability insurance required in connection with the sale of alcoholic beverages (if applicable);

(x)      insurance against employee dishonesty in an amount required by Lender (if applicable);

(xi)      with respect to commercial property, general liability, business income, and umbrella liability insurance required under this Section 5.1(a) (including, if applicable, insurance required under Section 5.1(a)(iv) above), insurance for loss resulting from perils and acts of terrorism in amounts and with terms and conditions applicable to commercial property, general liability, business income, and umbrella liability insurance required under this Section 5.1(a). The policy or endorsement providing for such insurance shall be in form and substance reasonably satisfactory to Lender and shall satisfy Rating Agency criteria for securitized loans; and

(xii)     upon sixty (60) days' notice, such other insurance and in such amounts as Lender may, from time to time, reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(b)      All insurance provided for in Section 5.1(a) shall be obtained under valid and enforceable policies (each individually, a "**Policy**"; collectively, the "**Policies**") and, to the extent not specified above, shall be subject to the approval of Lender as to insurers, amounts, deductibles, loss payees and insureds, which approval shall not be unreasonably withheld, conditioned or delayed. Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies (and, upon Lender's request, certified copies of such Policies or such other evidence as shall be acceptable to Lender) accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder (the "**Insurance Premiums**") shall be delivered by Borrower to Lender.

(c)      Any blanket insurance Policy shall be subject to Lender's approval, which approval shall be conditioned upon, among other things, evidence satisfactory to Lender that such Policy provides the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 5.1(a).

(d)      All Policies of insurance provided for or contemplated by Section 5.1(a) shall be primary coverage and shall name Borrower as a named insured and, in the case of liability policies, except for the Policy referenced in Section 5.1(a)(v) and (viii), Lender and its successors and/or assigns as the additional insured, as its interests may appear, and, in the case of property insurance (including, but not limited to, flood, earthquake, boiler and machinery, and terrorism insurance), shall name Lender and its successors and/or assigns, as their interests may appear, as mortgagee pursuant to a non-contributing mortgagee clause (or its equivalent) in favor of Lender and its successors and/or assigns providing that the loss thereunder shall be payable to Lender and its successors and/or assigns. Borrower shall not procure or permit any of its constituent entities to procure any other insurance coverage which would be on the same level of payment as the Policies or would adversely impact in any way the ability of Borrower or Lender to collect any proceeds under any of the Policies.

(e)      All property insurance provided for in Section 5.1(a) shall: (a) provide that no act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, or foreclosure or similar action, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned; (b) to the extent permitted by the insurer, provide that the Policy shall not be canceled or permitted to lapse without at least thirty (30) days' written notice to Lender, except ten (10) days' written notice for non-payment of premium; (c) not contain any provisions which would make Lender be liable for any Insurance Premiums thereon or subject to any assessments thereunder; and (d) provide that the issuers thereof shall give written notice to Lender if the issuers of the Policies elect not to renew prior to its expiration.

{00979456;7}

-39-